**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 48522)
ak@kazlg.com
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Telephone: 800.400.6808
Facsimile: 800.520.5523

**KAZEROUNI LAW GROUP, APC**
Yana A. Hart, Esq. (SBN: 306499)
yana@kazlg.com
2221 Camino Del Rio, Suite 101
San Diego, CA 92108
Tel.: (619) 233-7770
Fax:  (619) 297-1022

*Counsel for Plaintiffs & the*
*Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MISHARI ALEISA and NICOLE BELLUOMINI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SQUARE, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 3:20-cv-00806<br><br>**CLASS ACTION COMPLAINT**<br><br>**VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT OF 1991**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Mishari Aleisa and Nicole Belluomini (collectively, "Plaintiffs"), individually and on behalf of all others persons similarly situated, by their undersigned attorneys, as and for their Class Action Complaint against Defendant Square, Inc. ("Square") allege the following based upon personal knowledge as to

themselves and their own actions and, as to all other matters, upon information and belief and due investigation of counsel.

## NATURE OF THE CASE

1.     Square's troubling data collection and aggregation practices in order to acquire and to monetize massive amounts of consumer information are well-publicized.

2.     A recent Wall Street Journal article, *Square Sends Millions of Digital Receipts, Sometimes to the Wrong Person*, detailed that Square has "access to years of data on the purchase activity of hundreds of millions of unique credit and debit cards across millions of small businesses," which provides "a window into spending patterns that few other tech companies can match."[1]

3.     In May 2017, a Square executive acknowledged that the company had sent over 350 million digital receipts and used that data to build a customer directory of 90 million emails and phone numbers within the prior 12 months.[2]

4.     Square admits that it is taking "something as simple and fundamental as a digital receipt" and creating "a valuable customer directory and a suite of tools that take advantage of it."[3]

5.     More broadly, Square's practices demonstrate "the methods that tech companies employ to make money off of the financial data of their users, as well as the degree to which those companies disclose or get consent from their users about those efforts."[4]

6.     As noted in the Wall Street Journal article, Square has "assemble[d] expansive profiles of consumer behavior that it can use to run marketing and loyalty programs for its small-business customers."[5]

---

[1]  *See* https://www.wsj.com/articles/square-sends-millions-of-digital-receipts-sometimes-to-the-wrong-person-11559640601 (last accessed January 27, 2020).
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*

7.     In an effort to profit off of the tremendous amounts of consumer data it acquires by processing millions of credit and debit transactions annually, Square, in 2012, launched its "Squareup Loyalty Program."

8.     Square is paid (based on volume) by its small business clients to send automated text messages to consumers; these "loyalty texts" are marketing for Square's small-business clients in that they inform their consumers that they are eligible for various rewards programs in order to incentivize repeat business.[6]

9.     This case challenges Square's practices to gain access to consumers' cellular phone number and send tens of thousands of autodialed telemarketing text messages to those consumers, without clear disclosures and consumer consent, for the financial benefit of Square and its small business clients.

10.     Square owns and operates the hardware and software for a point of sale ("POS") system called "the Reader," which debuted in 2009.

11.     The Reader is a square-shaped device that employees at small businesses (independent retailers, coffee shops, food trucks and the like) can plug into their smartphone or tablet to process payment card transactions.

12.     Upon completing a card transaction using Square's POS system, consumers are presented a screen by which they can elect to receive their receipt via text message or via electronic mail ("e-mail") message. If consumers choose the text receipt option, Square requires them to enter their cell phone number.[7]

13.     When consumers enter their cell phone number to obtain their receipt,

---

[6] *See* https://www.fastcompany.com/1840740/square-gets-app-loyalty-cards-and-minor-facelift (last accessed January 27, 2020); https://squareup.com/us/en/townsquare/are-you-overlooking-this-simple-super-effective-marketing-tactic (last accessed January 27, 2020)

[7] This case does *not* challenge Square's practice of sending digital receipts via text message. Upon information and belief, Square automatically sends digital receipts to consumers who have elected to receive receipts by e-mail and provides consumers the option to receive digital receipts via text message. Rather, this case challenges the association of consumers' payment card information with their mobile phone numbers in to (i) create expansive consumer profiles on millions of consumers; and (ii) to use that consumer data to market and to profit off of its loyalty program by sending thousands upon thousands of unsolicited loyalty messages without prior consent.

Square's POS system does not inform them that their phone number will be captured, stored and linked with the payment card used to complete the transaction.

14.     Put another way and as detailed by the recent Wall Street Journal article, Square, "[b]y supplementing that data with contact details that shoppers provide [] for the purpose of getting digital receipts, the company is able to assemble expansive profiles of consumer behavior that it can use to run marketing and loyalty programs for its small-business customers."[8]

15.     The impact of this improper association of payment card information with mobile phone numbers is felt when, for example, a consumer visits a completely unrelated establishment and uses that same payment card to complete a purchase, Square--having already associated that payment card number with the previously provided mobile number--sends that consumer (and thousands of others) unwanted and unsolicited "loyalty texts" for marketing purposes.

16.     The consumers who enter their cell phone number into Square's POS system and subsequently receive "loyalty texts" (i) received no clear and conspicuous disclosure and provided no consent whatsoever to receive loyalty texts or (ii) received woefully insufficient disclosure before providing their phone number and therefore could not have provided meaningful consent to receive loyalty texts sent by Square on behalf of its SquareUp loyalty clients.

---

[8]   *See* https://www.wsj.com/articles/square-sends-millions-of-digital-receipts-sometimes-to-the-wrong-person-11559640601 (last accessed January 27, 2020)



17.     The loyalty texts are not sent by a person, but automatically through Square's technology.

18.     By automatically capturing consumers' phone numbers obtained as a result of their requests to receive digital receipts and storing into them in its Loyalty Program database, Square unlawfully obtained cell phone numbers for Plaintiffs and the Class (as defined below) for purposes of sending autodialed telemarketing text messages to Plaintiffs and the Class without their prior express written consent for the benefit of Square and its small business clients, in plain violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*

19.     Specifically, Square violated the TCPA by using its loyalty program to send loyalty texts to consumers (i) who did not opt into the program and only provided their phone number to obtain a receipt via text message and (ii) who, when they opted into the program, were not made aware that they would receive loyalty texts not just from the business whose program they intended to opt into,

but also from other Square clients as a result of merely using the same payment card.

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227, *et seq*.

15.     This Court has personal jurisdiction over Square because it is located in this District and because the conduct at issue in this case occurred in, among other locations, California.

16.     Venue is proper because Square is a California business with its principal place of business in San Francisco, California, and a substantial portion of the events alleged herein occurred within this District.

## PARTIES

17.     Plaintiff Mishari Aleisa is a citizen of the State of California, residing in the City of San Francisco, and is a member of the Class defined herein.

18.     Plaintiff Nicole Belluomini is a citizen of the State of California, residing in the City of Kentfield, and is a member of the Class defined herein.

19.     Defendant Square, Inc. is a Delaware corporation with its headquarters in San Francisco, California.

20.     Defendant Square, Inc. is, and at all times mentioned herein was a "person," as defined by 47 U.S.C. § 153(39).

## BACKGROUND OF THE TCPA

21.     The TCPA exists to prevent unsolicited communications like those described herein; "[v]oluminous consumer complaints about abuses of telephone technology—for example, computerized calls dispatched to private homes—prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S.Ct. 740, 744 (2012).

22.     The TCPA regulates, among other things, the use of automated telephone equipment or "autodialers."

23.     Specifically, the plain language of section 227(b)(1)(A)(iii) of the TCPA prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party. The TCPA's definition of an autodialer includes a "predictive dialer." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638-39 (7th Cir. 2012).

24.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited.

25.     As Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

26.     The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used. *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C Rcd. 14014, 14115 ¶ 165 (2003).

27.     On January 4, 2008, the FCC issued a Declaratory Ruling confirming that autodialed calls and calls using an artificial voice or prerecorded message to a wireless number are permitted only if the calls are made with the "prior express consent" of the called party. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 2008 WL 65485 (2008).

28.     On February 15, 2012, the FCC took steps to further protect consumers from unwanted autodialed marketing calls. Among other things, the FCC issued a Declaratory Ruling requiring that telemarketers obtain "prior express written consent" for all autodialed or prerecorded telemarketing calls to wireless numbers. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act. Of 1991*, 27 F.C.C. Rcd. 1830, 1831 (2012) ("2012 FCC Ruling").

29.     In the 2012 FCC Ruling, the FCC further clarified that a consumer's written consent to receive telemarketing robocalls "must be signed and be

sufficient to show that the consumer: (i) received 'clear and conspicuous disclosure' of the consequences of providing the requested consent, *i.e.*, that the consumer will receive further autodialed calls or calls that deliver prerecorded messages by or on behalf of a specific seller; and (ii) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.' *See also* 47 C.F.R. § 64.1200(f)(8). Finally, the FCC noted that should any question about the consent arise, "the seller will bear the burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained." 2012 FCC Ruling, 27 F.C.C. Rcd. At 1844.

30.   The TCPA's ban on telephone calls made using an automatic telephone dialing system ("ATDS" or "autodialer"), as defined by 47 U.S.C. § 227(a)(1), has been interpreted to extend to unsolicited autodialed text messages sent to cellular phones. *E.g.,* FCC Declaratory Ruling, 27 F.C.C.R. 15391, 2012 WL 5986338 (Nov. 29, 2012); *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 876 (9th Cir. 2014); *Gager v. Dell Fin. Servs., Inc.*, 727 F.3d 265, 269 n.2 (7th Cir. 2013).

31.   As recently held by the Ninth Circuit Court of Appeals: "Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients. A plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond the one Congress has identified.'" *Van Patten v. Vertical Fitness Grp.*, No. 14-55980, 2017 U.S. App. LEXIS 1591, at *12 (9th Cir. May 4, 2016) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)).

1
2
3

## FACTUAL ALLEGATIONS – SQUARE'S PRACTICE OF SENDING UNSOLICITED MARKETING LOYALTY MESSAGES TO CONSUMERS VIOLATES THE TCPA

4
5

32.     Square's POS solutions primarily target small businesses that want a simple method for processing credit and debit card payments.

6
7

33.     Square contracts with its small business clients in order to provide, among other things, those payment processing solutions.

8
9
10
11

34.     Square does not directly contract with consumers who patronize their small business clients.  However, consumers who pay with a credit or debit card at a business that uses Square cannot avoid using its services and being subject to its opportunistic data collection and monetization practices.

12
13
14

35.     Since its launch in 2009, Square has rapidly become one of the industry leaders in mobile payment solutions and processed millions and millions of transactions.

15
16
17

36.     When a consumer's credit or debit card is processed by Defendant's POS, the system then prompts consumers to select whether they want a receipt and how they want to receive their receipt (via e-mail or text).

18
19
20

37.     Figures 1 and 2, below, show the variations of the screen that a consumer sees following the completion of a transaction consummated with the Square POS system on an iPad.

21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12



*Figure 1*

13
14
15
16
17
18
19
20
21
22
23
24
25



*Figure 2*

26   38.   After entering their phone number to obtain a text message receipt,

27 consumers are then taken to the following screen, Figure 5, which invites them to

28 join a rewards program that will earn them "points."

39.    The screen contains no clear and conspicuous language or notice to consumers that, by entering their phone number, they consent to receive automated marketing text messages:



*Figure 3*

40.    Figures 4 and 5 show variations of screens for consumers completing a transaction consummated with the Square POS system on an iPhone.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



*Figure 4*

20    41.    The smartphone interaction in Figure 4 includes a disclaimer, under

21  the "Email Receipt" box, informing consumers that they "may receive marketing

22  messages."

23    42.    However no such disclaimer is provided under the "Text Receipt"

24  box.

25    43.    Moreover, the "disclosure," such as it is, is not TCPA-compliant nor

26  is it clear and conspicuous.

27    44.    Figure 5, below, is the screen a consumer sees following the

28  completion of a transaction using the Square POS system on a smartphone.

45.    This smartphone interaction includes, in minuscule print on an already small screen, a disclaimer at the bottom stating that, "by providing your contact information, you agree businesses you frequent may send you digital receipts, marketing and messages via Square."

46.    Unlike the iPad interface in Figure 2, which provides the option of a printed receipt, consumers who interact with Square on a smartphone are not provided the option to obtain a printed receipt.



*Figure 5*

47.    If the consumer chooses not to enter their cell phone number to sign up for rewards points (but did enter their cell phone number to obtain a digital receipt), Square nevertheless takes the phone number associated with the payment card and sends unsolicited marketing loyalty texts when the consumer subsequently uses the same card at any business participating in Square's Loyalty Program.

48.    If a consumer chooses to enter their phone number to receive rewards points, they are informed *after entering their phone number* to check their text messages for more information.

49.    Figure 6 shows the screen consumers see after they opt into the Loyalty Program:



*Figure 6*

50.    Square's conduct of failing to disclose or to obtain express consent from consumers before sending them loyalty texts is knowing, willful and/or intentional.

51.    Furthermore, Defendant markets the "Loyalty Program" to its small business clients by expressly stating, on its website, that the program uses the POS system to send "automated" text messages to consumers:

> After customers enroll, they receive an *automated text message* welcoming them to the program and inviting them to supply their email address for an additional star. Once they're in the system, you can reach out to them through **Square Email Marketing**.

…

> So how do you get started? Easy. **Square Loyalty** is a digital rewards program that *integrates directly with your POS*, and it's just $25 per month per location. Setup takes just a couple of minutes, and you're on your way.[9]

52.   What Square fails to mention in its marketing of the Loyalty Program is that customers who do "enroll" do *not* provide consent to receive those automated text messages from any business. And worse, even customers who do not "enroll" still receive automated text messages from Square.

53.   Square's website provides that when consumers enter their cell phone number in order to request a receipt via text message they will receive loyalty text messages "automatically" when they use the same payment card at other retailers who are utilizing SquareUp loyalty members, without any disclosure to or consent by the consumers:

**Step 1:**   A consumer completes a purchase with a merchant who uses the Square Reader system and requests a receipt via text message, which Square sends in short order.

**Step 2:**   Square retains that consumer's payment card information and associates it with the provided mobile phone number in its database.

**Step 3:**   That same consumer makes a different purchase at a different Square client-merchant, using the same credit card, without necessarily asking for a receipt.

**Step 4:**   If that second merchant is a SquareUp Loyalty Program client, the consumer automatically receives a text message stating that the consumer had earned a certain number of loyalty points in that merchant's loyalty program (even if that consumer had not opted-in to the second merchant's Loyalty Program).  On information and belief, consumers are not even presented with an option to opt-in

---

[9]   https://squareup.com/us/en/townsquare/are-you-overlooking-this-simple-super-effective-marketing-tactic_(emphasis added)

to the second (and subsequent) SquareUp Loyalty programs; rather, they are automatically opted-in by Square.

54.     Distressingly, Square's small business clients, through their dashboard on their Square POS system, have the ability to access their customers' personal information and to *unilaterally* enroll those customers into the Loyalty Program.

55.     Consumers are neither informed nor given any opportunity to decline permission for these businesses to do this.

56.     Square's instructions to its small business clients read as follows:

- Head to the **Customers** section of your **online Square Dashboard** or Square app.
- Select or create a customer profile.
- Under the **Loyalty** section, click or tap **Create Account**.
- Enter the customer's mobile phone number > **Save.**[10]

---

[10] https://squareup.com/help/us/en/article/6462-square-loyalty-faqs (emphasis added)

## FACTS SPECIFIC TO PLAINTIFFS

### *Plaintiff Mishari Aleisa*

57.    Plaintiff Mishari Aleisa is, and at all times relevant to this action has been, the regular and sole user of his cellular telephone number: XXX-XXX-5566.

58.    Sometime prior to July 28, 2018, Plaintiff Aleisa visited the Samovar Teahouse Cafe ("Samovar") on Fillmore Street in San Francisco, California.

59.    After placing his order, Plaintiff Aleisa presented his payment card, which was processed by Square via its POS system on an Ipad.

60.    When the last prompt was presented (similar to that seen in Figure 5 above), Plaintiff Aleisa entered his telephone number to earn loyalty rewards at Samovar.

61.    Following his transaction at Samovar, on July 28, 2018 at approximately 9:17PM, Square sent an automated text message to Plaintiff Aleisa's cellular telephone from the phone number (904) 495-7904, stating "You just got your first 1 Star from Samovar on Fillmore!"

62.    On or about June 23, 2019, Plaintiff Aleisa visited the Asha Tea House in Berkely, California ("Asha").

63.    After placing his order, Asha processed Plaintiff Aleisa's payment through Square's POS system.

64.    Upon information and good faith belief, Plaintiff Aleisa did not enter his telephone number to receive a copy of his digital receipt or to join Asha's loyalty program or to earn loyalty rewards at Asha.

65.    Nonetheless, following his transaction on June 23, 2019, at approximately 11:25 PM, Defendant sent another automated text message to Plaintiff Aleisa's cellular telephone from the phone number (904) 495-7904, this time stating, "You just got your first 1 Star from *Asha Tea House* (Berkeley)!" (emphasis added).

66.    Then, on or about July 4, 2019, Plaintiff Aleisa visited Avenues San

Francisco, in San Francisco, California ("Avenues").

67.   After placing his order, Avenues processed Plaintiff Aleisa's payment through Square's POS system.

68.   Upon information and good faith belief, Plaintiff Aleisa did not enter his telephone number to receive a copy of his digital receipt or to join Avenues' loyalty program or to earn loyalty rewards at Avenues.

69.   However, after his transaction, on or about July 4, 2019, at approximately 9:28 PM, Defendant sent an automated text message to Plaintiff's cellular telephone from the phone number (904) 495-7904, stating, "You just got your first 1 Star from *Avenues*!" (emphasis added).[11]

70.   A true and correct copy of the three text messages regarding three separate merchants is reproduced below:




///
///

_____

[11]  The links within the text messages redirect to a webpage for Square's loyalty program.

71.     Then, on or about August 11, 2019, at approximately 11:52 PM, Square sent a fourth automated text message to Plaintiff's cellular telephone from the telephone number (844) 344-6082.

72.     A true and correct copy of this text is reproduced below:

73.     However upon information and good faith belief, Plaintiff Aleisa had not visited Samovar on August 11, 2019, nor made any purchases from Samovar in the month of August 2019.

74.     At no point did Plaintiff Aleisa provide his telephone number to Asha (a small business venture selling coffees and teas started in 2012 by tea enthusiasts)[12] or Avenues (a similar small coffee and tea shop).

75.     Moreover, while Plaintiff Aleisa provided his telephone number to Samovar to receive a receipt for his purchase and rewards points only, Plaintiff Aleisa never provided express written consent to receive ongoing loyalty program notifications before entering his phone number into the Square POS system.

76.     Upon information and good faith belief, Square sent loyalty texts to Plaintiff's cellular phone number (and those of the putative class members) by using an ATDS as defined by 47 U.S.C. § 227(a)(1).

77.     Upon information and good faith belief, no human directed any of Square's text messages to Plaintiff Aleisa's cellular telephone number.

78.     Upon information and good faith belief, Square sent its text messages to Plaintiff Aleisa's cellular telephone number (and those of the putative class members) for non-emergency purposes.

79.     Plaintiff Aleisa suffered actual harm as a result of Square's text messages in that he suffered an invasion of privacy, an intrusion into his life and a private nuisance. Plaintiff Aleisa suffered lost utility of his phone—through diminished battery life and capacity incurred by receiving the text messages—and lost time opening and reading the text messages.

---

[12] https://www.ashateahouse.com/pages/about (last accessed January 27, 2020).

***Plaintiff Nicole Belluomini***

80.     Plaintiff Nicole Belluomini is, and at all times relevant to this action has been, the regular and sole user of her cellular telephone number: XXX-XXX-4446.

81.     On or about May 12, 2017, Plaintiff visited the Taste Kitchen & Table ("Taste") on Broadway Boulevard in Fairfax, California.

82.     After placing her order, Taste processed Plaintiff Belluomini's payment through Square's POS system.

83.     Upon information and good faith belief, Plaintiff Belluomini did not enter her telephone number to receive a copy of her digital receipt or earn loyalty rewards at Taste.

84.     Following Plaintiff Belluomini's transaction at Taste, at approximately 8:26AM, Square sent an automated text message to her cellular telephone from the phone number (310) 321-4319, stating "You just got your first loyalty star from Taste Kitchen & Table! Click for program details: https://squareup.com/outreach/welcome/7HYXQ0X6MC"

85.     A true and correct copy of the May 12, 2017 text message is reproduced below:



86.     The link within the text message (https://squareup.com/outreach/welcome/7HYXQ0X6MC) redirects to a webpage for Square's loyalty program affiliated with Taste Kitchen & Table.

87.     Upon information and good faith belief, Plaintiff Belluomini did not provide her telephone number to Taste to receive a digital receipt for her purchase.

88.     Plaintiff Belluomini never provided express written consent to receive loyalty program text messages when she made a purchase at Taste through the Square POS system.

89.     Upon information and good faith belief, Square sent loyalty texts to Plaintiff Belluomini's cellular phone number (and those of the putative class members) by using an ATDS as defined by 47 U.S.C. § 227(a)(1).

90.     Upon information and good faith belief, no human directed any of Square's text messages to Plaintiff Belluomini's cellular telephone number.

91.     Upon information and good faith belief, Square sent text messages to

Plaintiff Belluomini's cellular telephone number (and those of the putative class members) for non-emergency purposes.

92.     Plaintiff Belluomini suffered actual harm as a result of Square's text messages in that she suffered an invasion of privacy, an intrusion into her life and a private nuisance. Plaintiff Belluomini suffered lost utility of her phone—through diminished battery life and capacity incurred by receiving the text messages—and lost time opening and reading the text messages.

## STANDING

93.     Standing is proper under Article III of the Constitution of the United States of America because Plaintiffs' claims state:

- a valid injury in fact;
- which is traceable to the conduct of Defendant;
- and is likely to be redressed by a favorable judicial decision.

*See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

### *The "Injury in Fact" Prong*

94.     In order to meet the standard laid out in *Spokeo* and *Lujan*, Plaintiffs must clearly allege facts demonstrating all three prongs above.

95.     Plaintiffs' injuries in fact must be both "concrete" and "particularized" in order to satisfy the requirements of Article III of the Constitution, as laid out in *Spokeo*.

96.     For an injury to be "concrete" it must be a de facto injury, meaning that it actually exists.  *See, e.g.*, *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638 (7th Cir. 2012).

97.     In this case, Defendant Square sent multiple text messages to Plaintiffs' cellular telephones using an ATDS. Such text messages are a nuisance, an invasion of privacy and an expense to Plaintiffs. All three of these injuries are concrete and de facto.

98.     For an injury to be "particularized" means that the injury must "affect the Plaintiffs in a personal and individual way." *Spokeo*, 578 U.S. at 1548. In this case, Square sent multiple telephone messages to Plaintiffs' cellular telephones using an ATDS. Such text messages are a nuisance, an invasion of privacy and an expense to Plaintiffs.

**The *"Traceable to the Conduct of Defendant"* Prong**

99.     The second prong required to establish standing at the pleadings phase is Plaintiffs must allege facts to show that their injuries are traceable to the conduct of the Defendant.

100.     Here, the above-repeated text messages are directly and unequivocally linked to Square. Defendant's text messages each provided a link to Defendant's "squareup" loyalty program website. These text messages are the sole source of Plaintiffs' and the Class's injuries. Therefore, Plaintiffs have set forth facts that show that their injuries are traceable to Square's conduct.

**The *"Injury is Likely to be Redressed by a Favorable Judicial Opinion"***

101.     The third prong to establish standing at the pleading phase requires Plaintiffs to allege facts to show that the injury is likely to be redressed by a favorable judicial opinion.

102.     Plaintiffs' Prayers for Relief include a request for damages for each text sent by Square, as authorized by statute in 47 U.S.C. § 227, *et seq*.

103.     The statutory damages were set by Congress and specifically redress the financial, emotional and other non-quantifiable damages suffered by Plaintiffs.

104.     Furthermore, Plaintiffs' Prayers for Relief requests injunctive relief to restrain Square from these illegal practices in the future.

105.     The award of monetary damages and the order for injunctive relief redress the injuries of the past and prevent further injury in the future.

106.     Because all standing requirements of Article III of the U.S. Constitution, as laid out in *Spokeo* and its progeny, are satisfied Plaintiffs have

standing to sue Defendant on the stated claims.

## CLASS ALLEGATIONS

107.   Plaintiffs brings this action under Federal Rule of Civil Procedure 23, and as a representative of the following class:

> All persons throughout the United States (1) to whom Defendant delivered or caused to be delivered, a loyalty text message, (2) directed to a number assigned to a cellular telephone service, (3) by using an automatic telephone dialing system, (4) within four years preceding the date of this complaint through the date of class certification.

108.   Excluded from the class are Defendant, its officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendant has or had a controlling interest.

109.   Plaintiffs reserve the right to redefine the class and to add subclasses as appropriate based on discovery and specific theories of liability.

110.   **Numerosity**: Upon information and belief, the members of the class are so numerous that joinder of all of them is impracticable.

111.   The exact number of the members of the class is unknown to Plaintiffs at this time, and can (and will) be determined through appropriate discovery. However, given that, on information and belief, Defendant texted thousands of class members nationwide during the class period, it is reasonable to presume that the members of the Class are so numerous that joinder of all members is impracticable. The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.

112.   **Ascertainability**: The members of the class are ascertainable because the class is defined by reference to objective criteria.

113.   In addition, the members of the class are identifiable in that, upon

information and belief, their cellular telephone numbers, names and addresses can be identified in business records maintained by Defendant and by third parties.

114.   **Typicality**: Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs have had to suffer the burden of receiving text messages to their cellular telephones from an ATDS. Thus, their injuries are typical to Class Members. As they did for all members of the class, Defendant used an ATDS to deliver text messages to Plaintiffs' cellular telephone number.

115.   Plaintiffs' claims, and the claims of the members of the class, originate from the same conduct, practice and procedure on the part of Defendant.

116.   Plaintiffs' claims are based on the same theories, as are the claims of the members of the class.

117.   Plaintiffs and Class Members were harmed by the acts of Defendant in at least the following ways: Defendant harassed Plaintiffs and Class Members by illegally texting their cellular phones using an ATDS. Plaintiffs and the Class were damaged thereby.

118.   **Adequacy**: Plaintiffs are qualified to, and will fairly and adequately protect the interests of the members of the class with whom they are similarly situated, as demonstrated herein. Plaintiff acknowledges that he has an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member.

119.   Plaintiffs' interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the class.

120.   Plaintiffs will vigorously pursue the claims of the members of the Class.

121.   Plaintiffs have retained counsel experienced and competent in class action litigation. Plaintiffs' attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. In addition, the proposed class counsel is experienced in handling clams involving consumer

actions and violations of the TCPA.

122.   Plaintiffs' counsel will vigorously pursue this matter.

123.   Plaintiffs' counsel will assert, protect and otherwise represent the members of the Class.

124.   Plaintiffs have incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each Class Member.

125.   **Predominance**: The questions of law and fact common to the members of the class predominate over questions that may affect individual members of the class. The elements of the legal claims brought by Plaintiffs and Class Members are capable of proof at trial through evidence that is common to the Class rather than individual to its members.

126.   **Commonality**: There are common questions of law and fact as to all members of the Class, including but not limited to the following:

    a.    What is Defendant's conduct, pattern, and practice as it pertains to delivering advertisement and telemarketing text messages;

    b.    Whether, within the statutory period, Defendant used an ATDS as defined by the TCPA to send text messages to Class Members;

    c.    Whether Defendant's conduct violated the TCPA;

    d.    Whether Defendant should be enjoined from engaging in such conduct in the future; and

    e.    The availability of statutory penalties.

127.   **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this matter because:

- If brought and prosecuted individually, the claims of the members of the class would require proof of the same material and substantive facts.

- The pursuit of separate actions by individual members of the class would, as a practical matter, be dispositive of the interests of other members of the class, and could substantially impair or impede their ability to protect their interests.

- The pursuit of separate actions by individual members of the class could create a risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendant.

- These varying adjudications and incompatible standards of conduct, in connection with presentation of the same essential facts, proof, and legal theories, could also create and allow the existence of inconsistent and incompatible rights within the class.

- The damages suffered by each individual member of the class may be relatively modest, thus, the expense and burden to litigate each of their claims individually make it difficult for the members of the class to redress the wrongs done to them.

- Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

- The pursuit of Plaintiffs' claims, and the claims of the members of the class, in one forum will achieve efficiency and promote judicial economy.

- There will be little difficulty in the management of this action as a class action.

- Defendant has acted or refused to act on grounds generally applicable to the members of the class, making final declaratory or injunctive relief appropriate.

- Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful

conduct.

128.   This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of Class Members and it expressly is not intended to request any recovery for personal injury and claims related thereto.

## CAUSES OF ACTION

### COUNT I

### Violations of the Telephone Consumer Protection Act

### 47 U.S.C. § 227 *et seq.*

129.   Plaintiffs incorporate herein all preceding factual allegations.

130.   Plaintiffs and Class members are, and at all times mentioned herein were, "person(s)" as defined by 47 U.S.C. § 153(39).

131.   The text messages that Defendant sent were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

132.   The text messages from Defendant also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

133.   The TCPA prohibits the use of an ATDS or autodialer to make any call or send any text message to a wireless phone number without the prior express consent of the contacted party or in the absence of an emergency.

134.   The foregoing acts and omissions of Defendant constitute numerous and multiple violations of the TCPA, including but not limited to each of the above cited provisions of 47 U.S.C. § 227, *et seq.*

135.   As a result of Defendant's violations of 47 U.S.C. § 227, *et seq.*, Plaintiffs and Class members are entitled to an award of $500 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

136.   As a result of Defendant's violations of 47 U.S.C. § 227, *et seq.*, Plaintiffs and Class members have been subjected to nuisance text messages, have been forced to waste time reviewing, deleting and/or responding to Defendant's unsolicited automated text messages, and have suffered invasions of their privacy

and unwanted use of data storage space on their cellular telephones.

137.   Plaintiffs and Class members also suffered damages in the form of text message, data, and other charges to their cellular telephone plans.

138.   Plaintiffs and Class members are also entitled to and do seek injunctive relief prohibiting Defendant's violation of the TCPA in the future.

139.   Plaintiffs and Class members are also entitled to an award of attorneys' fees and costs and provided by law.

## COUNT II

### Willful Violations of the Telephone Consumer Protection Act
### 47 U.S.C. § 227, *et seq.*

140.   Plaintiffs incorporates herein all preceding factual allegations.

141.   Plaintiffs and Class members are, and at all times mentioned herein were, "person(s)" as defined by 47 U.S.C. § 153(39).

142.   The text messages that Defendant sent were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

143.   The text messages from Defendant also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

144.   The TCPA prohibits the use of an ATDS or autodialer to make any call or send any text message to a wireless phone number without the prior express consent of the contacted party or in the absence of an emergency.

145.   The foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227, *et seq*.

146.   As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227, *et seq*., Plaintiffs and Class members are each entitled to treble damages of up to $1,500 for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

147.   As a result of Defendant's knowing and/or willful violations of 47

U.S.C. § 227, *et seq*., Plaintiffs and Class members have been subjected to nuisance text messages, have been forced to waste time reviewing, deleting, and/or responding to Defendant's unsolicited automated text messages, and have suffered invasions of their privacy and unwanted use of data storage space on their cellular telephones.

148.   Plaintiffs and Class members also suffered damages in the form of text message, data, and other charges to their cellular telephone plans.

149.   Plaintiffs and Class members are also each entitled to and do seek injunctive relief prohibiting such conduct violating the TCPA by Defendant in the future.

150.   Plaintiffs and Class members are also entitled to an award of attorneys' fees and costs as provided by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the following relief against Defendant:

- An Order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class (and any Subclasses the Court deems appropriate), finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

- Adjudging and declaring that Defendant violated 47 U.S.C. § 227(b)(1)(A)(iii);

- Injunctive relief prohibiting such violations of the TCPA by Defendant in the future;

- Awarding Plaintiffs and Class members damages under 47 U.S.C. § 227(b)(3)(B) of up to $500 for each and every text message violation of the TCPA;

- Awarding Plaintiffs and Class members treble damages under 47 U.S.C. § 227(b)(1) of up to $1,500 for each and every text message violation of the TCPA;
- Awarding Plaintiffs and the Class reasonable attorneys' fees, costs and expenses under Federal Rule of Civil Procedure 23;
- Awarding Plaintiffs and Class members any pre-judgment and post-judgment interest as may be allowed under the law; and
- Awarding such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs and the Class Members are entitled to, and demand, a trial by jury.


Dated: February 3, 2020          Kazerouni Law Group, APC

By: *s/ Abbas Kazerounian*
Abbas Kazerounian, Esq.
ak@kazlg.com
*Counsel for Plaintiff and the Putative Class*