# EXHIBIT B

Stamp and Return

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of | ) | |
| 1991 | ) | |

Accepted / Filed

MAY − 3 2018

Federal Communications Commission
Office of the Secretary

**PETITION FOR DECLARATORY RULING**

Harold Kim
Executive Vice President
U.S. Chamber Institute for Legal Reform
1615 H Street, NW
Washington, DC 20062

Tim Day
Senior Vice President
U.S. Chamber Technology Engagement Center
1615 H Street, NW
Washington, DC 20062

Karen M. Scheibe Eliason
Vice President & Senior Counsel
ACA International
4040 West 70th Street
Minneapolis, MN 55435

Mark W. Brennan
Partner
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

*On behalf of the American Association of Healthcare
Administrative Management*

Virginia O'Neill
Senior Vice President
American Bankers Association
1120 Connecticut Avenue, NW
Washington, DC 20036

Bill Himpler
Executive Vice President
American Financial Services Association
919 18th Street, NW, Suite 300
Washington, DC 20012

Steven I. Zeisel
Executive Vice President & General Counsel
Consumer Bankers Association
1225 I Street, NW
Washington, DC 20005

Anne Canfield
Executive Director
Consumer Mortgage Coalition
600 Cameron Street
Alexandria, VA 22314

Jim Nussle
Chief Executive Office
Credit Union National Association
601 Pennsylvania Avenue, NW
Washington, DC 20004

Aryeh B. Fishman
Associate General Counsel,
Regulatory Legal Affairs
Edison Electric Institute
701 Pennsylvania Avenue, NW
Washington, DC 20004

Scott Talbott
Senior Vice President, Government Relations
Electronic Transactions Association
1620 L Street, NW, #1020
Washington, DC 20036

Rich Foster
Senior Vice President & Senior Counsel for
Regulatory and Legal Affairs
Financial Services Roundtable
600 13th Street, NW, Suite 400
Washington, DC 20005

Howard Fienberg
Vice President, Advocacy
Insights Association
1156 15th Street, NW, Suite 302
Washington, DC 20003

Justin Wiseman
Associate Vice President & Managing
Regulatory Counsel
Mortgage Bankers Association
1919 M Street, NW, 5th Floor
Washington, DC 20036

Carrie R. Hunt
Executive Vice President of Government
Affairs & General Counsel
National Association of Federally-Insured
Credit Unions
3138 10th Street North
Arlington, VA 22201

Thomas Karol
General Counsel, Federal
National Association of Mutual Insurance
Companies
3601 Vincennes Road
Indianapolis, IN 46268

Angelo I. Amador
Executive Director
Restaurant Law Center
2055 L Street, NW
Washington, DC 20036

Winfield P. Crigler
Executive Director
Student Loan Servicing Alliance
1100 Connecticut Avenue, NW, Suite 1200
Washington, DC 20036

May 3, 2018

## TABLE OF CONTENTS

SUMMARY ..................................................................................................................i

I.   THE TCPA LANDSCAPE IS DYSFUNCTIONAL AND IN NEED OF CLARITY FROM THE FCC. .................................................................................12

    A.   In the TCPA, Congress targeted specific telemarketing practices and spam activities but the statute's reach has been improperly expanded many times. ......................................................................................12

    B.   The Omnibus Order distorted the TCPA's plain meaning and clear definition of "ATDS." ...............................................................................17

    C.   The D.C. Circuit vacated the Omnibus Order's ATDS interpretation as unreasonable, arbitrary and capricious. .......................................19

II.   THE COMMISSION SHOULD CONFIRM THAT TO BE AN ATDS, EQUIPMENT MUST USE A RANDOM OR SEQUENTIAL NUMBER GENERATOR TO STORE OR PRODUCE NUMBERS AND DIAL THOSE NUMBERS WITHOUT HUMAN INTERVENTION. ....................21

III.   THE COMMISSION SHOULD FIND THAT ONLY CALLS MADE USING ACTUAL ATDS CAPABILITIES ARE SUBJECT TO THE TCPA'S RESTRICTIONS. ................................................................................................25

IV.   CONCLUSION..................................................................................................27

## SUMMARY

The U.S. Chamber of Commerce, the U.S. Chamber Institute for Legal
Reform, and the U.S. Chamber Technology Engagement Center (collectively "the
Chamber"), ACA International, American Association of Healthcare Administrative
Management, American Bankers Association, American Financial Services
Association, Consumer Bankers Association, Consumer Mortgage Coalition, Credit
Union National Association, Edison Electric Institute, Electronic Transactions
Association, Financial Services Roundtable, Insights Association, Mortgage Bankers
Association, National Association of Federally-Insured Credit Unions, National
Association of Mutual Insurance Companies, Restaurant Law Center, and Student
Loan Servicing Alliance request that the Commission expeditiously issue a declaratory
ruling to clarify the Telephone Consumer Protection Act's ("TCPA") definition of
automatic telephone dialing system ("ATDS").  In light of the D.C. Circuit's decision
on the FCC's interpretation of ATDS, Petitioners ask that the Commission (1)
confirm that to be an ATDS, equipment must use a random or sequential number
generator to store or produce numbers and dial those numbers without human
intervention, and (2) find that only calls made using actual ATDS capabilities are
subject to the TCPA's restrictions.

The TCPA landscape is dysfunctional and in need of clarity from the FCC.
The statute, originally intended to target a specific abusive telemarketing practice, has
been expanded by courts and the FCC, turning it into a breeding ground for frivolous

i

lawsuits against legitimate businesses trying to communicate with their customers. As a result, TCPA litigation has skyrocketed, harming businesses large and small, with no clear benefit to consumers. Recent regulatory efforts, like the 2015 *Omnibus Order*, have not helped—they made matters worse. That *Order* distorted the TCPA's plain meaning and clear definition of "ATDS," expanding it to potentially include devices such as smartphones and tablets.

The D.C. Circuit recognized the serious flaws in the 2015 *Omnibus Order* and recently vacated its ATDS interpretation as unreasonable, arbitrary and capricious. In that opinion, the court provided a logical roadmap for how the Commission should interpret ATDS. The Commission should follow the court's guidance in interpreting that phrase.

First, the Commission should confirm that to be an ATDS, equipment must use a random or sequential number generator to store or produce numbers and dial those numbers without human intervention. This straightforward interpretation flows from the functions of an ATDS outlined in the TCPA. The Commission should also make clear that these functions must be actually—not theoretically—present and active in a device at the time the call is made. The FCC should also clarify that if human intervention is required in generating a list of numbers to call or in making a call, then the equipment in use is not automatic and therefore not an ATDS. Adopting this interpretation follows the statutory text and would provide clarity to businesses seeking to reach their customers.

Next, the Commission should find that only calls made using actual ATDS capabilities are subject to the TCPA's restrictions.  The D.C. Circuit noted that the FCC's expansive interpretation of ATDS could be addressed by reinterpreting the statutory phrase "make any call . . . using [an ATDS]," to mean that a device's ATDS capabilities must actually be used to place a call for TCPA's restrictions to attach. This interpretation, first espoused by Commissioner O'Rielly, would diminish the significance of the Commission's expansive understanding of capacity, comport with the ordinary meaning of the statute, and limit TCPA liability.

iii

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

In the Matter of )

Rules and Regulations Implementing the ) CG Docket No. 02-278
Telephone Consumer Protection Act of )
1991 )

## PETITION FOR DECLARATORY RULING

Pursuant to 47 C.F.R. § 1.2, the U.S. Chamber of Commerce, the U.S.

Chamber Institute for Legal Reform, and the U.S. Chamber Technology Engagement

Center (collectively "the Chamber"), ACA International, American Association of

Healthcare Administrative Management, American Bankers Association, American

Financial Services Association, Consumer Bankers Association, Consumer Mortgage

Coalition, Credit Union National Association, Edison Electric Institute, Electronic

Transactions Association, Financial Services Roundtable, Insights Association,

Mortgage Bankers Association, National Association of Federally-Insured Credit

Unions, National Association of Mutual Insurance Companies, Restaurant Law

Center, and Student Loan Servicing Alliance respectfully request that the Federal

Communications Commission ("FCC" or "the Commission") expeditiously issue a

declaratory ruling to clarify the Telephone Consumer Protection Act's[1] ("TCPA" or

"the Act") definition of automatic telephone dialing system ("ATDS") in light of the

---

[1]     47 U.S.C. § 227.

D.C. Circuit's guidance in its recent *ACA Int'l. v. FCC* decision.[2]  Specifically, Petitioners request that the Commission promptly: (1) confirm that to be an automatic telephone dialing system ("ATDS"), equipment must use a random or sequential number generator to store or produce numbers and dial those numbers without human intervention, and (2) find that only calls made using actual ATDS capabilities are subject to the TCPA's restrictions.

The U.S. Chamber of Commerce is the world's largest business federation, representing the interests of more than three million businesses of all sizes and sectors, as well as state and local chambers and industry associations. The U.S. Chamber Technology Engagement Center ("C_TEC") promotes the role of technology in our economy and advocates for rational policy solutions that drive economic growth, spur innovation, and create jobs. The U.S. Chamber Institute for Legal Reform ("ILR") is an affiliate of the Chamber that promotes civil justice reform through regulatory, legislative, judicial, and educational activities at the global, national, state, and local levels.  ILR has long been involved in issues involving the TCPA, which imposes substantial compliance burdens on American business and generates enormous litigation risk and expense.  Over many years, ILR has engaged in research and published papers analyzing the TCPA, concluding that the TCPA has

---

[2]     *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018).

become a major impediment to commerce, burdening how businesses communicate with their customers and generating thousands of lawsuits.

ACA International ("ACA") is an international trade organization of credit and collection professionals that provides a wide variety of accounts receivable management services.  With offices in Washington, DC and Minneapolis, MN, ACA represents approximately 3,000 members ranging from third-party debt collectors, debt purchasers, attorneys, credit grantors, and vendor affiliates who employ more than 230,000 employees worldwide.  ACA members contact consumers exclusively for *non-telemarketing* reasons to facilitate the recovery of payment for services that have already been rendered, goods that have already been received, or loans that have already been provided.  Debt collection companies play an important role in the U.S. economy by returning funds owed to both businesses and public-sector entities as well, including federal, state, and local governments.  The use of modern technology is critical for facilitating compliance with the myriad federal, state, and local laws that govern all aspects of communications between ACA member companies and consumers.  In particular, the TCPA has a significant impact on the ability of debt collectors to lawfully contact consumers.  Given the importance of effective communication to successful debt recovery, ACA has consistently led advocacy efforts to modernize the TCPA to better balance consumer privacy with legitimate business communications.

3

The American Association of Healthcare Administrative Management ("AAHAM") is the premier professional organization in healthcare administrative management focused on education and advocacy in the areas of reimbursement, admitting and registration, data management, medical records, and patient relations. AAHAM was founded in 1968 as the American Guild of Patient Account Management. Initially formed to serve the interests of hospital patient account managers, AAHAM has evolved into a national membership association that represents a broad-based constituency of healthcare professionals. Professional development of its members is one of the primary goals of the association. Publications, conferences and seminars, benchmarking, professional certification and networking offer numerous opportunities for increasing the skills and knowledge that are necessary to function effectively in today's health care environment. AAHAM actively represents the interests of healthcare administrative management professionals through a comprehensive program of legislative and regulatory monitoring and its participation in industry groups such as ANSI, DISA and NUBC. AAHAM is a major force in shaping the future of health care administrative management. One of AAHAM's main focuses has been on efforts to change the TCPA for the healthcare profession. Today's TCPA is outdated and limits our ability meet all the regulatory requirements placed on the healthcare industry through the Affordable Care Act. Healthcare has changed and how we reach patients and

4

consumers has changed.  This is why AAHAM continues to be engaged in an effort to modernize the TCPA to fit today's healthcare environment.

The American Bankers Association is the voice of the nation's $17 trillion banking industry, which is composed of small, regional, and large banks that together employ more than 2 million people, safeguard $13 trillion in deposits, and extend more than $9 trillion in loans.

Founded in 1916, the American Financial Services Association ("AFSA") is the national trade association for the consumer credit industry, protecting access to credit and consumer choice.  AFSA members provide consumers with many kinds of credit, including traditional installment loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.

The Consumer Bankers Association is the only national trade focused exclusively on retail banking.  Established in 1919, the association is now a leading voice in the banking industry and Washington, representing members who employ nearly two million Americans, extend roughly $3 trillion in consumer loans, and provide $270 billion in small business loans.  Our members greatly value the important communications their customers consent to, including notifications such as low-balance alerts, due-date reminders, and account milestone notices.  Our members strive to provide the best customer experience possible, and effective means of communication is a key aspect of that relationship.

5

The Consumer Mortgage Coalition is a mortgage industry trade association committed to streamlining and simplifying the rules and regulations governing the industry so that they can best serve consumers.

The Credit Union National Association ("CUNA") represents America's credit unions and their 110 million members.  Credit union members are being harmed by unclear guidance about how they can receive communications such as text messages about vitally important financial information, including ways they can improve and protect their own finances.  The Bureau of Consumer Financial Protection has recognized that protecting consumers includes the ability to be in timely communication with them, and the FCC should do the same.  CUNA further believes wireless informational calls to credit union member-owners with whom the credit union has an established business relationship, or where such call or text message is free, should be exempt from the TCPA's prior express consent requirement for autodialed and artificial or prerecorded voice calls.

Edison Electric Institute ("EEI") is the trade association that represents all U.S. investor-owned electric companies.  Our members provide electricity for 220 million Americans, and operate in all 50 states and the District of Columbia.  As a whole, the electric power industry supports over seven million jobs in communities across the United States.  In addition to our U.S. members, EEI has more than 60 international electric companies, with operations in more than 90 countries, as International Members, and hundreds of industry suppliers and related organizations as Associate

6

Members.  Organized in 1933, EEI provides public policy leadership, strategic

business intelligence, and essential conferences and forums.  EEI's members are

major users of telecommunications systems to support the goals of clean power, grid

modernization, and providing customer solutions.  On behalf of the owners and

operators of a significant portion of the U.S. electricity grid, EEI has filed comments

before the Commission in various proceedings affecting the telecommunications'

rights and obligations of its members who are impacted by the FCC's rules and

policies.

The Electronic Transactions Association ("ETA") is the global trade

association representing more than 500 payments and technology companies.  ETA

members make commerce possible by processing more than $4.5 trillion in purchases

in the U.S. and deploying payments innovations to merchants and consumers.

Representing more than 4,000 members across the United States, the Insights

Association is the leading nonprofit trade association for the market research and data

analytics industry, and the leader in establishing industry best practices and enforcing

professional standards.  The Insights Association's membership includes both

research and analytics companies and organizations, as well as the researchers and

analytics professionals and research and analytics departments inside of non-research

companies and organizations.  Marketing researchers are an essential link between

businesses and consumers, and between political leaders and constituents; they

provide important insights about consumer and constituent preferences through

7

surveys, analytics, and other qualitative and quantitative research.  On behalf of their clients—including the government, media, political campaigns, and commercial and non-profit entities—researchers design studies and collect and analyze data from small but statistically-balanced samples of the public.  Researchers seek to determine the public's opinion and behavior regarding products, services, issues, candidates, and other topics in order to help develop new products, improve services, and inform public policy.  The TCPA makes it exceptionally challenging, and legally hazardous, for telephone survey researchers to connect with the 67.6 percent of American households who are essentially only reachable on their wireless phones, which is why we intervened in the court challenge to the 2015 FCC rules.

The Financial Services Roundtable ("FSR") is the leading advocacy organization for America's financial services industry.  With a 100- year tradition of service and accomplishment, FSR is a dynamic, forward-looking association advocating for the top financial services companies, keeping them informed on the vital policy and regulatory matters that impact their business.  FSR member banks frequently face compliance challenges with TCPA in a variety of contexts, particularly relating to banks' ability to fight fraud.

The Mortgage Bankers Association ("MBA") is the national association representing the real estate finance industry, an industry that employs more than 280,000 people in virtually every community in the country.  Headquartered in Washington, DC, the association works to ensure the continued strength of the

8

nation's residential and commercial real estate markets; to expand homeownership; and to extend access to affordable housing to all Americans.  MBA promotes fair and ethical lending practices and fosters professional excellence among real estate finance employees through a wide range of educational programs and a variety of publications.  Its membership of over 2,200 companies includes all elements of real estate finance: mortgage companies, mortgage brokers, commercial banks, thrifts, REITs, Wall Street conduits, life insurance companies, and others in the mortgage-lending field.

The National Association of Federally-Insured Credit Unions ("NAFCU") is the only national trade association focusing exclusively on federal issues affecting the nation's federally-insured credit unions.  NAFCU provides its members with advocacy, education, and compliance assistance to meet the ongoing challenges that cooperative, community-based financial institutions face in today's economic and regulatory environment.  The association proudly represents many smaller credit unions with relatively limited operations, as well as many of the largest, most sophisticated credit unions in the country.  Currently, NAFCU represents 70 percent of total federal credit union assets and 46 percent of all federally-insured credit union assets.

For more than 120 years, the National Association of Mutual Insurance Companies ("NAMIC") has been serving in the best interests of mutual insurance companies—large and small—across the United States, as well as Canada.  NAMIC is

9

the largest property/casualty insurance trade association with more than 1,400 member companies serving more than 170 million auto, home, and business policyholders.  NAMIC member companies write nearly $230 billion in annual premiums, and have 54 percent of homeowners, 43 percent of automobile, and 32 percent of the business insurance markets.  Insurance companies rely upon systems that require the combination of human interaction with automation, ranging from notifying claimants of completion of repairs to the lateness of a payment.  Such customer services are essential to the transactions.

The Restaurant Law Center ("Law Center") is a public policy organization affiliated with the National Restaurant Association, the largest foodservice trade association in the world.  Nationally, the industry is made up of one million restaurant and foodservice outlets employing over 14 million people—about ten percent of the American workforce.  Restaurants and other foodservice providers are the nation's second-largest private-sector employers.  The Law Center provides courts with the industry's perspective on legal issues significantly impacting it.  Many restaurants and other foodservice outlets communicate with their customers and employees by phone and by text messages, and many have been defendants in suits filed under the Telephone Consumer Protection Act, Pub. L. No. 102-243, 105 Stat. 2394, codified at 47 U.S.C. § 227 ("TCPA"), based on such communications.  The Law Center, therefore, has a strong interest in the proper interpretation and application of the statute.

10

The Student Loan Servicing Alliance ("SLSA") is a nonprofit trade association made up of approximately 20 federal student loan servicers that collectively service over 95 percent of the outstanding student loans in the two chief federal student loan programs, the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan Program. SLSA members also service the vast majority of private education loans. There are over 40 million borrowers with almost $1.5 trillion in outstanding student loans, and servicing this massive loan portfolio requires substantial communications to assist borrowers. Servicers call borrowers to educate them on and facilitate the use of myriad repayment options, and federal loan servicers are required by regulation and contract to make calls to delinquent borrowers. The majority of student loan borrowers have only a cell phone, and thus the ability to reach borrowers to help them avoid delinquency and default hinges on the ability to contact them effectively and efficiently by cell phone.

The Petitioners represent legitimate businesses and organizations, large and small, covering nearly every aspect of the economy. They seek to send time-critical, communications to their customers and members promptly and efficiently. Moreover, the Petitioners' members are operating in good-faith when trying to contact consumers but have been subject to abusive class action litigation by plaintiffs' attorneys asserting an unreasonably expansive interpretation of ATDS. Ultimately, these lawsuits are harming consumers and the public at large. They are chilling helpful, time-sensitive communications with customers, while leaving fewer

11

resources for businesses to innovate and create jobs. We have consistently urged the

FCC to rationalize the dysfunctional TCPA regime,[3] which no longer reflects the

statute's purpose or text. We urge the FCC to take prompt action on the ATDS issue

in light of the D.C. Circuit's recent opinion vacating the 2015 *Omnibus Order*'s

treatment of the issue, and adopt the court's roadmap for interpreting this issue.

## I.   THE TCPA LANDSCAPE IS DYSFUNCTIONAL AND IN NEED OF CLARITY FROM THE FCC.

### A.   In the TCPA, Congress targeted specific telemarketing practices and spam activities but the statute's reach has been improperly expanded many times.

Congress enacted the TCPA in 1991 to stop an abusive form of cold-call

telemarketing and fax-blast spamming: dialing random or sequential numbers.[4] In

promulgating its initial rules implementing the Act, the Commission acknowledged

the TCPA's goal of "restrict[ing] the most abusive telemarketing practices."[5] As then-

---

[3]     *See, e.g.*, U.S. Chamber Reply Comments on Petition for Clarification or Declaratory Ruling filed by ContextMedia, Inc. d/b/a Outcome Health, CG Docket No. 02-278 (filed Dec. 12, 2017); U.S. Chamber Comments on Advance Methods to Target and Eliminate Unlawful Robocalls, CG Docket No. 17-59 (filed Aug. 28, 2017); U.S. Chamber Comments on Petition for Declaratory Ruling filed by All About the Message, LLC, CG Docket No. 02-278 (filed May 18, 2017); U.S. Chamber Comments on Petition for Rulemaking and Declaratory Ruling filed by Craig Cunningham and Craig Moskowitz, CG Docket No. 02-278; CG Docket No. 05-338 (filed Mar. 10, 2017).

[4]     *See* S. Rep. 102-178 at 1-2 (1991) (stating that the purpose of the TCPA is to "plac[e] restrictions on unsolicited, automated telephone calls to the home" and noting complaints regarding telemarketing calls); H.R. Rep. No. 102–317 at 6-7 (1991) (citing telemarketing abuse as the primary motivator for legislative action leading to the TCPA). *See also* Comments of the U.S. Chamber and ILR, *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, at 2-3 (filed Mar. 10, 2017).

[5]     *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Report and Order, 7 FCC Rcd. 8752, n.24 (Oct. 16, 1992) *("1992 Report and Order")*.

12

Commissioner Pai observed, "Congress passed the [TCPA] to crack down on intrusive telemarketers and over-the-phone scam artists."[6] The TCPA was intended to target nuisance calls using a specific technology, not legitimate business calls consumers desire that are placed to telephone numbers belonging to those consumers. Indeed, in the Preamble, Congress cited to the "proliferation of *intrusive, nuisance calls* to [consumers'] homes from telemarketers" as a reason for enacting the legislation.[7] The Supreme Court recognized that "Congress determined that federal legislation was needed because *telemarketers*, by operating interstate, were escaping state-law prohibitions on *intrusive nuisance calls*."[8] The D.C. Circuit recently described the TCPA as "a statute grounded in concerns about hundreds of thousands of 'solicitors' making 'telemarketing' calls on behalf of tens of thousands of 'businesses.'"[9] At the same time, the Commission has recognized repeatedly that the

---

[6]   *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Declaratory Ruling and Order, 30 FCC Rcd. 7961, 8072 *("Omnibus Order")* (Dissenting Statement of then-Commissioner Ajit Pai) ("Pai Dissent").

[7]   Telephone Consumer Protection Act of 1991, PL 102-243, 105 Stat. 2394, § 2 (Dec. 20, 1991) (emphasis added).

[8]   *Mims v. Arrow Financial Services, LLC,* 565 U.S. 368, 370 (2012) (also citing the Preamble of the TCPA) (emphasis added); *see also Emanuel v. Los Angeles Lakers, Inc.,* 2013 WL 1719035, at *3 (Courts "broadly recognize that not every text message or call constitutes an actionable offense; rather, the TCPA targets and seeks to prevent the proliferation of intrusive, nuisance calls.") (internal quotations omitted).

[9]   *ACA Int'l,* 885 F.3d at 698.

13

TCPA should accommodate businesses' legitimate interests in communicating with consumers.[10]

Unfortunately, the Commission's implementation of the Act and numerous court decisions over the years have fostered a whirlwind of litigation not against abusive callers and scammers, but against legitimate businesses attempting to lawfully communicate with their customers. Interpretations by the courts and the FCC have strayed far from the statute's text, Congressional intent, and common sense. The TCPA has turned into a breeding ground for frivolous lawsuits brought by serial plaintiffs and their lawyers who have made lucrative businesses out of targeting legitimate U.S. companies.[11] The focus of these lawsuits often is not on unscrupulous

---

[10]    *See Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, ¶ 21 (2012). In a 1992 rulemaking action implementing the TCPA, the FCC ruled that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary," *1992 Report and Order*, ¶ 31 (citing H.R. Rep No. 102–317, at 13 (1991) ("[T]he called party has in essence requested the contact by providing the caller with their telephone number for use in normal business communications.")). Then, in its 2008 ruling, the FCC "clarif[ied] that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *Rules & Reg's Implementing the Tel. Consumer Prot. Act of 1991*, Declaratory Ruling, 23 FCC Rcd. 559, ¶ 1 (2008) ("2008 Declaratory Ruling") (quoting 47 U.S.C. § 227(b)(1)(A)). The 2008 Declaratory Ruling reasoned that "the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." *2008 Declaratory Ruling*, ¶ 9. The FCC regulations that took effect on October 16, 2013, recognized that business/transactional calls are different, and carved out *telemarketing* calls to cellular telephones from the general paradigm wherein providing a phone number constituted implied consent to receive closely related calls, requiring instead prior express *written* consent for ATDS calls that constituted telemarketing. *See* 47 C.F.R. § 64.1200(a)(2).

[11]    *See* Letter from ACA International et al to the Members of the U.S. House of Representatives, (Mar. 8, 2017), http://www.instituteforlegalreform.com/uploads/sites/1/TCPA_Coalition_Letter_FICALA_to_House.pdf. *See also* Pai Dissent ("The TCPA's private right of action and $500 statutory penalty could incentivize plaintiffs to go after the illegal telemarketers, the over-the-phone scam artists,

14

scam telemarketers.  Instead, plaintiffs pursue marginal or technical violations in the

hope of large judgments.  For example, a group of fans sued the Los Angeles Lakers

for sending text messages confirming receipt of fan-originated texts.[12]  Similarly, a

ride-sharing service was sued for texts confirming receipt of ride requests.[13]  And

Mammoth Mountain Ski Area was sued for calling a group of litigants who had

previously provided consent.[14]  The TCPA has become a major obstacle for American

businesses seeking to communicate with consumers.[15]  Ultimately, consumers are hurt

the most, as the costs of these lawsuits lead to increased prices for goods and services.

The amount of TCPA litigation has exploded.  Under one analysis, the number

of TCPA lawsuits increased from 2,127 in the 17 months prior to the FCC's 2015

*Omnibus Order* to 3,121 in the 17 months after the *Order*.[16]  Making matters worse,

statutory damages unrelated to actual harm can add up to staggering amounts.[17]  The

---

[12]    *Emanuel,* 2013 WL 1719035.

[13]    *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1193 (W.D. Wash. 2014).

[14]    *Story v. Mammoth Mountain Ski Area, LLC*, No. 2:14-cv-02422-JAM, 2015 WL 2339437 (E.D. Cal. May 13, 2015).

[15]    *See The Juggernaut of TCPA Litigation: The Problems with Uncapped Statutory Damages*, U.S. Chamber Institute for Legal Reform at 12 (October 2013), http://www.instituteforlegalreform.com/uploads/sites/1/TheJuggernautofTCPALit_WEB.PDF ("What is clear is that the TCPA's uncapped statutory damages pose a real threat to large and small well-intentioned American companies who have potentially millions of customers and who often need to communicate with those consumers.").

[16]    *See TCPA Litigation Sprawl: A Study of the Sources and Targets of Recent TCPA Lawsuits,* U.S. Chamber Institute for Legal Reform (August 2017), http://www.instituteforlegalreform.com/research/tcpa-litigation-sprawl-a-study-of-the-sources-and-targets-of-recent-tcpa-lawsuits.

[17]    For example, Capital One settled a TCPA lawsuit for $75 million in 2014.  One New Jersey women received $229,500 against her cable provider in July 2015.  *King v. Time Warner Cable*, 113 F.

15

scope of the law has expanded, greatly increasing compliance costs[18] and reaching technologies that were not commercially deployed in 1991, such as text messages. And even if these lawsuits are frivolous, they still take time and money to defend. More litigation means more resources a company must divert from its core functions. Further, for small businesses the threat of a TCPA lawsuit with its uncapped statutory damages can spur questions of bankruptcy and place crippling distress on an owner. The result has been a boondoggle for plaintiffs' lawyers.[19]

Regulatory uncertainty and enormous settlements that benefit plaintiffs' lawyers do nothing to aid consumers and the economy. Needless "enforcement actions or lawsuits" chill efforts by "good actors and innovators" to develop "new consumer-friendly communications services."[20] The status quo is not in the public interest, and it undermines the rule of law.

---

Supp. 3d 718 (S.D.N.Y. 2015). And one Wisconsin woman received $571,000 in 2013 against the finance company calling her husband's phone after she defaulted on car payments. *Nelson v. Santander Consumer USA, Inc.*, 2013 WL 1141009 (W.D. Wisc., March 8, 2013), a decision later vacated by agreement of the parties as part of a confidential settlement. *See also, generally,* Bull v. US Coachways, Inc., No. 1:14-cv-05789 (N.D. Ill. 2014) (settling for $49.9 million).

[18]     For example, requiring prior express written consent for certain calls, or requiring businesses to keep millions of recordings solely because potential TCPA challenges might arise years after a transaction regarding prior consent.

[19]     *Engineered Liability: The Plaintiffs' Bar's Campaign to Expand Data Privacy and Security Litigation*, U.S. Chamber Institute for Legal Reform, at 5 (Apr. 2017). *See also, generally,* Statement of the U.S. Chamber Institute for Legal Reform and U.S. Chamber of Commerce on the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, to the Senate Committee on Commerce, Science, and Transportation, available at http://www.instituteforlegalreform.com/uploads.

[20]     Commissioner O'Rielly, *TCPA: It is Time to Provide Clarity*, FCC Blog (Mar. 25, 2014, 2:10 PM), https://www.fcc.gov/news-events/blog/2014/03/25/tcpa-it-time-provide-clarity.

**B.**    The *Omnibus Order* distorted the TCPA's plain meaning and clear definition of "ATDS."

Confusion over what constitutes an ATDS generated litigation over calls placed to customer-provided numbers.  Seeking to limit such lawsuits, multiple petitioners asked the FCC to provide common sense guidance on modern technologies and their distinction from the kind of random/sequential number generating systems targeted by the TCPA.  In addition, a number of courts encouraged the Commission to address the issue.[21]  But despite the pleas for clarity,[22] the *Omnibus Order* made matters worse by expanding the Commission's interpretation of what constitutes an ATDS.

The FCC adopted an extremely broad interpretation of the term "capacity" as used in the Act's definition of ATDS.[23]  The unreasonably expansive reading included not only devices that can generate random or sequential numbers but also those that cannot.  For example, it swept in devices that, though they do not currently autodial,

---

[21]    *See, e.g., Freeman v. Specialty Retailers Inc.*, No. CV H-14-2691, 2015 WL 12804530 (S.D. Tex. Jan. 20, 2015); *Barrera v. Comcast Holdings Corp.*, No. 14–cv–00343–TEH, 2014 WL 1942829 (N.D.Cal. May 12, 2014); *Matlock v. United Healthcare Servs., Inc.*, No. 2:13-CV-02206-MCE-EF, 2014 WL 1155541 (E.D. Cal. Mar. 20, 2014); *but see Jordan v. Nationstar Mortg. LLC*, No. 14-CV-00787-WHO, 2014 WL 5359000, at *11 (N.D. Cal. Oct. 20, 2014); *Prater v. Medicredit Inc.*, 45 F. Supp. 3d 1038, 1043 (E.D. Mo. 2014).

[22]    *See, e.g., ACA International*, Petition for Rulemaking, RM No. 11712 (filed Feb.11, 2014); *Glide Talk, Ltd.*, Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (filed Oct. 28, 2013); *YouMail, Inc.*, Petition for Expedited Declaratory Ruling, CG Docket No. 02-278, filed April 19, 2013 (YouMail Petition).

[23]    *Omnibus Order*, ¶ 15.  *See also* 47 U.S.C. § 227(a)(1) (defining ATDS to mean "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers").

could be modified to do so in the future.[24]  Numerous commenters advocated a more

reasonable approach.[25]  According to then-Commissioner Pai, the FCC's

interpretation was not only bad policy, it was "flatly inconsistent with the TCPA."[26]

As he observed, "[t]he statute lays out two things that an automatic telephone dialing

system must be able to do or, to use the statutory term, must have the 'capacity' to do.

If a piece of equipment cannot do those two things—if it cannot store or produce

telephone numbers to be called using a random or sequential number generator and if

it cannot dial such numbers—then *how can it possibly meet the statutory definition*."[27]

   The *Omnibus Order*'s distortion of the statute subjected vast swaths of

communications to potential liability, despite the fact that in 1991, "lawmakers did not

intend to interfere with 'expected or desired communications between businesses and

their customers.'"[28]  Not surprisingly, with vastly expanded potential liability, TCPA

---

[24]   *Omnibus Order*, ¶¶ 10-14.

[25]   *See, e.g.,* Glide Reply Comments on Glide Petition, CG Docket No. 02-278 at 5-6 (filed Jan. 22, 2014); GroupMe, Inc.'s Comments on Glide Petition, CG Docket No. 02-278 at 6-7 (filed Jan. 3, 2014); Comments of Twilio, Inc. in Support of Petitions for Expedited Declaratory Ruling, CG Docket No. 02-278 at 13 (Dec. 19, 2013); Communication Innovators' Petition for Declaratory Ruling, CG Docket No. 02-278 (filed Jun. 7, 2012).

[26]   Pai Dissent.

[27]   *Id.* (emphasis added).  *See also id.*, Pai Dissent ("That position is flatly inconsistent with the TCPA. . . .To use an analogy, does a one-gallon bucket have the capacity to hold two gallons of water? Of course not."); *see also id.*, O'Rielly Dissent.

[28]   *Id.* (quoting Report of the Energy and Commerce Committee of the U.S. House of Representatives, H.R. Rep. 102-317, at 17 (1991)).

18

litigation increased 46 percent after the *Omnibus Order*, with class actions comprising approximately one-third of those filings.[29]

### C. The D.C. Circuit vacated the *Omnibus Order's* ATDS interpretation as unreasonable, arbitrary and capricious.

Numerous petitioners sought judicial review of the *Omnibus Order*'s unjustifiable expansion of the TCPA, arguing that the regime was unreasonable, impractical, and inconsistent with the statute's text.  The D.C. Circuit vacated portions of the *Omnibus Order* in *ACA Int'l v. FCC*, including the Commission's interpretation of ATDS, holding that the interpretation of capacity was "utterly unreasonable," "incompatible with" the statute's goals, and "impermissibly" expansive.[30]  The court held that FCC's interpretation that a device's capacity could include "features that can be added to the equipment's overall functionality through software changes or updates" had "the apparent effect of embracing any and all smartphones."[31]  The court found that such an interpretation was so unreasonable that it was "considerably beyond the agency's zone of delegated authority."[32]  It also found that the Commission had offered an

---

[29]     *See TCPA Litigation Sprawl: A Study of the Sources and Targets of Recent TCPA Lawsuits*, U.S. Chamber Institute for Legal Reform at 2, 4 (Aug. 2017), http://www.instituteforlegalreform.com/uploads/sites/1/TCPA_Paper_Final.pdf.

[30]     *ACA Int'l*, 885 F.3d at 699-700.

[31]     *Id.* at 695-96.

[32]     *Id.* at 698.

19

inconsistent and "inadequa[te]" explanation of what features constitute an ATDS,[33] "fall[ing] short of reasoned decisionmaking."[34]

The Chamber, ACA, and Consumer Bankers Association participated in the litigation and applaud the D.C. Circuit's determination that the FCC had exceeded its authority in expanding the definition of ATDS. Petitioners urge the Commission to use the D.C. Circuit's decision as an opportunity to rationalize the dysfunctional TCPA landscape. The FCC should expeditiously resolve legal uncertainty and bring common sense back to the statute by adopting a construction of what constitutes an ATDS that conforms to the statutory language and congressional intent. Petitioners urge the Commission to promptly: (1) confirm that to be an ATDS, equipment must use a random or sequential number generator to store or produce numbers and dial those numbers without human intervention, and (2) find that only calls made using actual ATDS capabilities are subject to the TCPA's restrictions.

There will no doubt be additional issues that the FCC is called on to address, but this critical issue merits speedy resolution, and is a critical first step to restoring a common-sense approach to the TCPA. This will provide businesses with certainty about the equipment they may use to communicate with customers and curtail frivolous TCPA litigation. Further, holding that dialing equipment subject to the

---

[33]    *Id.* at 702-03.

[34]    *Id.* at 701

20

TCPA is limited as specified by Congress in the statute would "respect the precise contours of the statute that Congress enacted."[35]

## II. THE COMMISSION SHOULD CONFIRM THAT TO BE AN ATDS, EQUIPMENT MUST USE A RANDOM OR SEQUENTIAL NUMBER GENERATOR TO STORE OR PRODUCE NUMBERS AND DIAL THOSE NUMBERS WITHOUT HUMAN INTERVENTION.

The FCC should immediately clarify that in order to be an ATDS subject to Section 227(b)'s restrictions,[36] dialing equipment must possess the functions referred to in the statutory definition: storing or producing numbers to be called, using a random or sequential number generator, and dialing those numbers.[37]

The TCPA defines an ATDS as a device that has the capacity to "store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers."[38]  A device must be able to generate numbers in either random order or in sequential order to satisfy the definition.  Otherwise, the device cannot do anything "using a random or sequential number generator."[39]  Next, it must be able to store or produce those numbers called using that random or sequential number generator.  This ability to store or produce telephone numbers to

---

[35]     *See* Pai Dissent.

[36]     The TCPA prohibits "mak[ing] any call . . . using an [ATDS]" to certain telephone numbers, including those assigned to wireless telephone services, absent an exception, such as prior express consent.  47 U.S.C. § 227(b)(1)(A).

[37]     47 U.S.C. § 227(a)(1).

[38]     47 U.S.C. § 227(a)(1)(A)-(B) (emphasis added).

[39]     47 U.S.C. § 227(a)(1)(A).

be called, alone, is insufficient; the clause "using a random or sequential number generator" modifies this phrase, requiring that the phone numbers stored or produced be generated using a random or sequential number generator.  Finally, the device must be able to dial those numbers.

The Commission should not deviate from this straightforward language. Devices that cannot perform these functions cannot meet the statutory definition of an ATDS.  Clarifying this definition (and rejecting earlier expansions that sweep all predictive dialers into the category of "ATDS")[40] is critical to restoring Congress' intent for what constitutes an ATDS.  Such a clarification would help businesses and other legitimate callers by confirming that both elements must be satisfied for a device to constitute an ATDS.

To further remove any confusion, the Commission should also make clear that both functions must be actually—not theoretically—present and active in a device at the time the call is made.  The statute uses the present tense to limit the use of equipment that "has the capacity" to perform the ATDS function and makes no reference to potential or theoretical capabilities.[41]  Chairman Pai found this "present capacity" or "present ability" approach was compelled by the text and purpose of the

---

[40]     In its 2003 TCPA Order, the Commission had determined that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS. 2003 Order, 18 FCC Rcd. at 14,091, ¶ 131 n.432; id. at 14,093 ¶ 133. But as the D.C. Circuit recognized, "at least some predictive dialers, as explained, have no capacity to generate random or sequential numbers." *ACA Int'l*, 885 F.3d at 703.

[41]     47 U.S.C. § 227(a)(1).

22

statute, the Commission's earlier approaches to the TCPA, as well as common sense.[42] This approach provides a clear, bright-line rule for callers. Callers do not need to worry about whether their calling equipment *could perhaps* one day be used as an ATDS. Instead, they can focus on what their devices *currently* do.

The FCC lacks the authority to go beyond the requirements of the clear statutory language. As Chairman Pai noted, the TCPA's restrictions are limited in their applicability to specific equipment; "if the FCC wishes to take action against newer technologies beyond the TCPA's bailiwick, it must get express authorization from Congress—not make up the law as it goes along."[43] Thus, as the D.C. Circuit noted, "[t]he Commission's capacious understanding of a device's 'capacity' lies considerably beyond the agency's zone of delegated authority for purposes of the *Chevron* framework."[44]

In clarifying which devices qualify as an ATDS, the Commission should hold that devices that require alteration to add autodialing capability are not ATDS. Rather, the capability must be inherent or built into the device for it to constitute an ATDS. To illustrate, smartphones require downloading an app or changing software code to gain autodialing capabilities. Those capabilities are not built in. By contrast,

---

[42]     *See, e.g,* Pai Dissent ("Had Congress wanted to define automatic telephone dialing system more broadly it could have done so by adding tenses and moods, defining it as 'equipment which has, has had, or could have the capacity.' But it didn't.")

[43]     Pai Dissent.

[44]     *ACA Int'l*, 885 F.3d at 698.

other calling equipment can become an autodialer simply by clicking a button on a drop-down menu.  That function is already part of the device and requires a simple change in setting rather an alteration of the device.  Devices with these inherent capabilities are an ATDS when these capabilities are in use.  Adopting this distinction would significantly narrow the range of devices considered ATDS, excluding smartphones, and comport with the statutory language.

The FCC can take this opportunity to clarify that the absence of human intervention is what makes an *automatic* telephone dialing system automatic.  This would clarify an issue on which the Commission has not been consistent.  The Commission has stated that the basic function of an ATDS is to dial numbers without human intervention,[45] but later acknowledged that a device might qualify as an ATDS even if it cannot dial numbers without human intervention.[46]  The Commission has stated that the impact of human intervention is a "case-by-case determination" based on "how the equipment functions and depends on human intervention."[47]  The FCC declined to provide additional clarity,[48] leaving callers without guidance.

The FCC should make clear that if human intervention is required in generating the list of numbers to call or in making the call, then the equipment in use is not an

---

[45]     *2003 TCPA Order* ¶ 132; *2008 Declaratory Ruling,* ¶ 13.

[46]     *Omnibus Order* ¶ 17.

[47]     *Id.*

[48]     *Id.* ¶ 20.

ATDS.  This comports with the commonsense understanding of the word

"automatic," and the FCC's original understanding of that word.[49]  It also heeds the

D.C. Circuit's suggestion that the absence of human intervention is important; a

logical conclusion, it found, "given that 'auto' in autodialer—or equivalently,

'automatic' in 'automatic telephone dialing system'—would seem to envision non-

manual dialing of telephone numbers.'"[50]  Importantly, it creates a clear rule for

businesses to follow and courts to enforce, instead of a vague, case-by-case analysis of

each piece of dialing equipment.

### III.   THE COMMISSION SHOULD FIND THAT ONLY CALLS MADE USING ACTUAL ATDS CAPABILITIES ARE SUBJECT TO THE TCPA'S RESTRICTIONS.

In the *Omnibus Order*, the FCC applied the TCPA's prohibitions to any call

using a device that *could be* an ATDS, regardless of whether the call was made using

ATDS capabilities.[51]  In striking down this interpretation, the D.C. Circuit outlined an

alternative approach, first raised by Commissioner O'Rielly in his *Omnibus Order*

dissent, that was not raised by the petitioners: reinterpreting the phrase "make any call

. . . using [an ATDS]" as used in the statute.[52]  The court suggested that the TCPA's

---

[49]    *2003 TCPA Order*, ¶ 132 ("The basic function of such equipment, however, has not changed—the *capacity* to dial numbers without human intervention.").

[50]    *ACA Int'l*, 885 F.3d at 703 (citation omitted).

[51]    *Omnibus Order*, ¶ 19 n.70.

[52]    *Id.* at 703-04; *see also* 47 U.S.C. § 227(b)(1)(A) ("It shall be unlawful . . . to make any call . . . using any automatic telephone dialing system . . . .").

text requires a caller to use the statutorily defined functions of an ATDS to make a call for liability to attach.[53]  It also noted that adopting this construction would "substantially diminish the practical significance of the Commission's expansive understanding of 'capacity' in the autodialer definition"[54]  Indeed, a device's potential capabilities would not be relevant to determining whether it is an ATDS, because the inquiry will focus only on the functions actually used to make the call or calls in question.  This interpretation would ensure that devices that are capable of gaining autodialer functions, such as smartphones, are only subject to the TCPA when used as autodialers.

The FCC should adopt the D.C. Circuit's roadmap and clarify that the TCPA is only implicated by *the use of actual ATDS capabilities in making calls*.  As the court suggested, the TCPA's prohibitions should apply only to calls *using ATDS capabilities*.[55] Here, a proper interpretation of the TCPA requires the calling equipment "use" ATDS capabilities to make the call.  Otherwise, the meaning of "using" would be vastly expanded and untethered from Congress' goals.

Adopting this straightforward reading would ensure that liability attaches only when ATDS capabilities are used to make a call, rather than sweeping in calls made

---

[53]     *ACA Int'l*, 885 F.3d at 704.

[54]     *Id.*

[55]     *Id.* at 703-04.  *See also* 47 U.S.C. § 227(b)(1)(A) ("It shall be unlawful . . . to make any call . . . using any automatic telephone dialing system . . . .").

26

using smartphones, tablets, and other devices that conceivably *could* be modified to support autodialing via an ATDS.  Businesses need this clear guidance, and it would help them avoid unnecessary litigation over whether they used an ATDS when placing calls to their customers.  Consistent with the Court's suggestion and the plain text of the statute, the Commission should adopt this interpretation.

## IV.    CONCLUSION

Petitioners respectfully request that, in light of the D.C. Circuit's decision and roadmap, the Commission expeditiously issue a declaratory ruling clarifying the meaning of "automatic telephone dialing system" as used in the TCPA.  Such a declaratory ruling should (1) make clear that to be an ATDS, equipment must use a random or sequential number generator to store or produce numbers and dial those numbers without human intervention, and (2) find that only calls made using actual ATDS capabilities are subject to the TCPA's restrictions.

As the dissenters to the *Omnibus Order* recognized, and as the D.C. Circuit held, the Commission's previous interpretations of "ATDS" have created confusion and uncertainty and have expanded that term well beyond Congress' intent.  As a result, businesses and other organizations are limiting the consumer-benefitting communications they send, while TCPA litigation has exploded, benefiting serial plaintiffs and lawyers at the expense of American businesses and consumers.  The D.C. Circuit's vacatur of the *Omnibus Order*'s treatment of ATDS presents an opportunity to restore rationality to this aspect of the TCPA.  Defining the elements

27

of an ATDS in accordance with the statute's clear definition is an important first step

in this effort, and would ensure that legitimate businesses can contact their consumers

without fearing a lawsuit under Section 227(b) of the TCPA.

Respectfully submitted,

/s/ Harold Kim
Harold Kim
Executive Vice President
U.S. Chamber Institute for Legal Reform
1615 H Street, NW
Washington, DC 20062

/s/ Tim Day
Tim Day
Senior Vice President
U.S. Chamber Technology Engagement Center
1615 H Street, NW
Washington, DC 20062

/s/ Karen M. Scheibe Eliason
Karen M. Scheibe Eliason
Vice President & Senior Counsel
ACA International
4040 West 70th Street
Minneapolis, MN 55435

/s/ Mark W. Brennan
Mark W. Brennan
Partner
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004

*On behalf of the American Association of Healthcare*
*Administrative Management*

28

/s/ Virginia O'Neill
Virginia O'Neill
Senior Vice President
American Bankers Association
1120 Connecticut Avenue, NW
Washington, DC 20036

/s/ Bill Himpler
Bill Himpler
Executive Vice President
American Financial Services Association
919 18th Street, NW, Suite 300
Washington, DC 20012

/s/ Steven I. Zeisel
Steven I. Zeisel
Executive Vice President & General Counsel
Consumer Bankers Association
1225 I Street, NW
Washington, DC 20005

/s/ Anne Canfield
Anne Canfield
Executive Director
Consumer Mortgage Coalition
600 Cameron Street
Alexandria, VA 22314

/s/ Jim Nussle
Jim Nussle
Chief Executive Office
Credit Union National Association
601 Pennsylvania Avenue, NW
Washington, DC 20004

29

/s/ Aryeh B. Fishman
Aryeh B. Fishman
Associate General Counsel,
Regulatory Legal Affairs
Edison Electric Institute
701 Pennsylvania Avenue, NW
Washington, DC 20004

/s/ Scott Talbott
Scott Talbott
Senior Vice President, Government Relations
Electronic Transactions Association
1620 L Street, NW, #1020
Washington, DC 20036

/s/ Rich Foster
Rich Foster
Senior Vice President & Senior Counsel for
Regulatory and Legal Affairs
Financial Services Roundtable
600 13th Street, NW, Suite 400
Washington, DC 20005

/s/ Howard Fienberg
Howard Fienberg
Vice President, Advocacy
Insights Association
1156 15th Street, NW, Suite 302
Washington, DC 20003

/s/ Justin Wiseman
Justin Wiseman
Associate Vice President & Managing
Regulatory Counsel
Mortgage Bankers Association
1919 M Street, NW, 5th Floor
Washington, DC 20036

30

/s/ Carrie R. Hunt
Carrie R. Hunt
Executive Vice President of Government
Affairs & General Counsel
National Association of Federally-Insured
Credit Unions
3138 10th Street North
Arlington, VA 22201

/s/ Thomas Karol
Thomas Karol
General Counsel, Federal
National Association of Mutual Insurance
Companies
3601 Vincennes Road
Indianapolis, IN 46268

/s/ Angelo I. Amador
Angelo I. Amador
Executive Director
Restaurant Law Center
2055 L Street, NW
Washington, DC 20036

/s/ Winfield P. Crigler
Winfield P. Crigler
Executive Director
Student Loan Servicing Alliance
1100 Connecticut Avenue, NW, Suite 1200
Washington, DC 20036

May 3, 2018

EXHIBIT B