# EXHIBIT 1

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4

5    MISHARI ALEISA and NICOLE        )
     BELLUOMINI, individually        )
6    and on behalf of all others     )
     similarly situated,             )
7                                     )   Case No.
                    Plaintiffs,       )   3:20-cv-00806-EMC
8            vs.                      )
                                      )
9    SQUARE, INC., a Delaware         )
     Corporation,                    )
10                                    )
                    Defendant.        )
11   _____ )

12

13

14

15      VIDEOTAPED VIRTUAL DEPOSITION OF YU SHAN FUNG

16                Los Angeles, California

17               Friday, August 7, 2020

18

19

20

21   Reported by:

22   ARCY M. DROPULIC

23   CSR No. 13394

24   Job No. 4185110

25   Pages 1-213

                                              Page 1

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4

5   MISHARI ALEISA and NICOLE    )
    BELLUOMINI, individually    )
6   and on behalf of all others  )
    similarly situated,        )

7                       )  Case No.
           Plaintiffs,   )  3:20-cv-00806-EMC
8       vs.             )
                      )
9   SQUARE, INC., a Delaware    )
    Corporation,           )
10                       )
           Defendant.    )
11  _____)

12

13

14

15     Videotaped Virtual Deposition of YU SHAN FUNG,

16   taken on behalf of Plaintiffs, in Los Angeles,

17   California, beginning at 9:04 a.m. and ending at

18   4:25 p.m., on Friday, August 7, 2020, before

19   ARCY M. DROPULIC, Certified Shorthand Reporter

20   No. 13394.

21

22

23

24

25

                                       Page 2

```
1    APPEARANCES:
2    For the Plaintiffs, Mishari Aleisa and Nicole Belluomini,
     individually and on behalf of all others similarly
3    situated:
4         KAZEROUNI LAW GROUP, APC
          BY:  ABBAS KAZEROUNIAN, ESQ.
5         (Appearing remotely via WebEx)
          245 Fischer Avenue, Suite D1
6         Costa Mesa, California 92626
          800-400-6808
7         ak@kazlg.com
8
9    For the Defendant, Square, Inc.:
10        SHEPPARD MULLIN
          BY:   SHANNON Z. PETERSEN, ESQ.
11        (Appearing remotely via WebEx)
          12275 El Camino Real, Suite 200
12        San Diego, California 92130
          858-720-8900
13        spetersen@sheppardmullin.com
14
15   Also Appearing Remotely:
16        Yana Hart, Esq.
17        Jason Ibey, Esq.
18        Martin White, Esq.
19        David Cannon, Esq.
20        Victor Renteria, Videographer
21
22
23
24
25
```

                                                              Page 3

```
1                          I N D E X
2     THE WITNESS                                      PAGE
3     YU SHAN FUNG
4        EXAMINATION BY MR. KAZEROUNI                     8
5
                          E X H I B I T S
6
      PLAINTIFFS'                 DESCRIPTION           PAGE
7
      Exhibit 1      Plaintiff Nicole Belluomini's       13
8                    First Amended Notice of Taking
                     Deposition of Defendant Square,
9                    Inc.'s Designated Representative
                     Pursuant to FRCP 30(B)(6)
10
      Exhibit 2      Defendant's Objection to            14
11                   Plaintiff's Notice of Deposition
                     Pursuant to FED. R. CIV. P.
12                   30(b)(6)
13    Exhibit 3      Class Action Complaint              56
14    Exhibit 4      Declaration of Yu-Shan Fung in      85
                     Support of Square's Motion to
15                   Dismiss for Lack of Subject
                     Matter Jurisdiction Under
16                   Article III
17    Exhibit 5      Amended Declaration of             119
                     Yu-Shan Fung in Support of
18                   Square's Motion to Dismiss for
                     Lack of Subject Matter
19                   Jurisdiction Under Article III
20    Exhibit 6      Defendant Square, Inc.'s Response  155
                     to Plaintiff Mishari Aleisa's
21                   Interrogatories (Set One)
22    Exhibit 7      Video                              158
23    Exhibit 8      Video                              159
24    Exhibit 9      Video                              162
25    Exhibit 10     Video                              165
```

Page 4

```
1    Exhibit 11       Video                                168

2    Exhibit 12       Video                                170

3    Exhibit 13       Video                                172

4    Exhibit 14       Video                                173

5    Exhibit 15       Video                                178

6    Exhibit 16       Request for Admission Responses      180

7    Exhibit 17       Various documents                    189

8    Exhibit 18       Receipts                             201

9    Exhibit 19       Various documents                    203

10

11

12

13

14

15              QUESTIONS INSTRUCTED NOT TO ANSWER

16                           (NONE)

17

18

19

20

21              INFORMATION REQUESTED

22                           (NONE)

23

24

25

                                              Page 5
```

```
1    BY MR. KAZEROUNI:                                        09:14AM

2        Q    But notwithstanding that, are these the topics  09:14AM

3    that you're prepared to testify to?                     09:14AM

4            MR. PETERSEN:  Same objection.                  09:14AM

5    BY MR. KAZEROUNI:                                        09:14AM

6        Q    Mr. Fung?                                       09:14AM

7        A    Can you repeat the question, please.           09:14AM

8        Q    Sure.  Notwithstanding your -- your counsel's  09:14AM

9    objections to these topics, are you qualified to speak as 09:14AM

10   to these topics in this document on behalf of Square?    09:14AM

11           MR. PETERSEN:  Same objection.                  09:14AM

12           But you can answer, Yu Shan.                     09:14AM

13           THE WITNESS:  Yes.                               09:14AM

14           MR. KAZEROUNI:  Okay.  So just so we have some   09:14AM

15   clarity for the record, I'd like to introduce Exhibit 2 to 09:15AM

16   show counsel's objections so we have a clear understanding 09:15AM

17   of what we were referencing regarding the objections.    09:15AM

18           (Plaintiffs' Exhibit 2 was marked for           09:15AM

19            identification by the Certified Shorthand        09:15AM

20            Reporter, a copy of which is attached hereto.)   09:15AM

21   BY MR. KAZEROUNI:                                        09:15AM

22       Q    And have you seen this document before, sir?   09:15AM

23       A    Yes.                                            09:15AM

24       Q    Okay.  Are you currently employed, Mr. Fung?   09:15AM

25       A    Yes, I am.                                      09:15AM
```

Page 14

| | | | |
|---|---|---|---|
| 1 | Q | Who are you employed by? | 09:15AM |
| 2 | A | Square. | 09:15AM |
| 3 | Q | And what is your position? | 09:15AM |
| 4 | A | I'm an engineer manager for the loyalty team. | 09:15AM |
| 5 | Q | Engineer manager for the loyalty team? | 09:15AM |
| 6 | A | Yes. | 09:15AM |
| 7 | Q | And how long have you had that position? | 09:15AM |
| 8 | A | About three years. | 09:15AM |
| 9 | Q | Were you employed at Square before you were given | 09:15AM |
| 10 | the title of the engineer manager? | | 09:16AM |
| 11 | A | I was -- I was also the engineer manager at a | 09:16AM |
| 12 | previous team before taking over this team. | | 09:16AM |
| 13 | Q | What team was that? | 09:16AM |
| 14 | A | Previously, I was the engineer manager for the | 09:16AM |
| 15 | Square marketing team. | | 09:16AM |
| 16 | Q | Marketing.  And how long were you the engineer | 09:16AM |
| 17 | manager of the marketing team at Square? | | 09:16AM |
| 18 | A | About two years. | 09:16AM |
| 19 | Q | And before that, were you still at Square? | 09:16AM |
| 20 | A | I initially started at Square in September 2015 | 09:16AM |
| 21 | as an engineer, but I was promoted to manager within about | 09:16AM |
| 22 | three months. | | 09:16AM |
| 23 | Q | Okay.  So after three months, you became the | 09:16AM |
| 24 | marketing engineer manager? | | 09:16AM |
| 25 | A | That's right. | 09:16AM |

Page 15

| | | | |
|---|---|---|---|
| 1 | Q | Okay.  And were you employed prior to September | 09:16AM |
| 2 | of 2015 before -- | | 09:17AM |
| 3 | A | Yes. | 09:17AM |
| 4 | Q | -- you joined Square? | 09:17AM |
| 5 | | I'm sorry. | 09:17AM |
| 6 | A | Yes. | 09:17AM |
| 7 | Q | Thank you. | 09:17AM |
| 8 | | And where were you employed before that? | 09:17AM |
| 9 | A | I was at a company called Locbox, L-o-c-b-o-x. | 09:17AM |
| 10 | Q | And where is that located? | 09:17AM |
| 11 | A | San Francisco, California. | 09:17AM |
| 12 | Q | And what kind of business is Locbox? | 09:17AM |
| 13 | A | It's a marketing software for local businesses. | 09:17AM |
| 14 | Q | And what was your position there? | 09:17AM |
| 15 | A | I was initially the lead engineer, later on I was | 09:17AM |
| 16 | promoted to the CTO. | | 09:17AM |
| 17 | Q | When did you start at Locbox? | 09:17AM |
| 18 | A | I would say about 2013. | 09:17AM |
| 19 | Q | And then when did you get promoted to the CTO? | 09:17AM |
| 20 | A | I think around May of 2015. | 09:18AM |
| 21 | Q | Okay.  And CTO is the chief technology officer? | 09:18AM |
| 22 | A | That's correct. | 09:18AM |
| 23 | Q | Okay.  And before Locbox, were you employed | 09:18AM |
| 24 | before 2013 when you joined them? | | 09:18AM |
| 25 | A | Yes, I was. | 09:18AM |

Page 16

| | | |
|---|---|---|
| 1 | Is that what you mean? | 09:38AM |
| 2 | A    That's correct. | 09:38AM |
| 3 | Q    Okay.  So the software communicates with the | 09:38AM |
| 4 | backend and then the backend sends an electronic | 09:38AM |
| 5 | communication to your texting vendor; is that correct? | 09:38AM |
| 6 | A    That's correct. | 09:38AM |
| 7 | Q    What kind of electronic communication are we | 09:38AM |
| 8 | talking about? | 09:38AM |
| 9 | A    These are also API requests over HTTP. | 09:38AM |
| 10 | Q    Over what?  I'm sorry? | 09:39AM |
| 11 | A    HTTP. | 09:39AM |
| 12 | Q    What does that mean? | 09:39AM |
| 13 | A    HTTP stands for -- I can't recall the exact | 09:39AM |
| 14 | definition, but that's the standard protocol they interact | 09:39AM |
| 15 | with anything on the Internet. | 09:39AM |
| 16 | Q    Okay.  So your server -- when I mean your, I mean | 09:39AM |
| 17 | Square server then talks to the vendor and the texting | 09:39AM |
| 18 | vendor through this mechanism that you just described? | 09:39AM |
| 19 | A    Yes.  Through the APIs that the vendor has | 09:39AM |
| 20 | provided. | 09:39AM |
| 21 | Q    Okay.  And is that communication recorded | 09:39AM |
| 22 | somewhere? | 09:39AM |
| 23 | A    We have records of the text message request that | 09:39AM |
| 24 | we have sent out to the vendors. | 09:39AM |
| 25 | Q    Okay.  And where are these requests kept? | 09:39AM |

Page 30

| | | |
|---|---|---|
| 1 | A    Also in the Square servers. | 09:40AM |
| 2 | Q    Okay.  And do you have all the records from 2017 | 09:40AM |
| 3 | to the present day? | 09:40AM |
| 4 | A    We -- we do have them. | 09:40AM |
| 5 | Q    Okay.  And you have access to them? | 09:40AM |
| 6 | A    Yes, I do. | 09:40AM |
| 7 | Q    Okay.  So in 2017, how many vendor or vendors did | 09:40AM |
| 8 | you use to communicate with? | 09:40AM |
| 9 | A    Can you repeat the question? | 09:40AM |
| 10 | Q    Sure.  In 2017, how many texting vendor or | 09:40AM |
| 11 | vendors Square using to send these text message | 09:40AM |
| 12 | communications? | 09:40AM |
| 13 | A    Are you referring to Square in general or just | 09:40AM |
| 14 | the Square loyalty product? | 09:40AM |
| 15 | Q    Loyalty product. | 09:40AM |
| 16 | A    The Square loyalty product in 2017, I believe, | 09:40AM |
| 17 | only used one vendor. | 09:40AM |
| 18 | Q    And who was that vendor? | 09:41AM |
| 19 | A    That vendor was Twilio. | 09:41AM |
| 20 | Q    Twilio? | 09:41AM |
| 21 | A    T-w-i-l -- | 09:41AM |
| 22 | THE REPORTER:  Can you spell that one more time? | 09:41AM |
| 23 | I'm sorry. | 09:41AM |
| 24 | THE WITNESS:  T-w-i-l-i-o. | 09:41AM |
| 25 | /// | 09:41AM |

Page 31

```
 1   BY MR. KAZEROUNI:                                   09:41AM

 2       Q   And so, for example, I think Ms. Belluomini's   09:41AM

 3   text message was sent in 2017.                     09:41AM

 4           Was Twilio the third-party vendor that sent that   09:41AM

 5   particular text message?                           09:41AM

 6       A   That's correct.                            09:41AM

 7       Q   And Mr. Aleisa's first text message was in 2017.   09:41AM

 8           Would that have been sent by Twilio?       09:41AM

 9       A   That's correct.                            09:41AM

10       Q   Now, did that vendor change at all for the   09:41AM

11   Loyalty Program or did you additional vendors between 2017   09:41AM

12   and the present day?                               09:41AM

13       A   We switched over to use Bandwidth,         09:41AM

14   B-a-n-d-w-i-d-t-h, Bandwidth, as the new SMS provider   09:42AM

15   sometime in 2018.                                  09:42AM

16       Q   So you just changed from Twilio to Bandwidth?   09:42AM

17       A   That's correct.                            09:42AM

18       Q   So you never used the two concurrently.    09:42AM

19           Would that be fair?                        09:42AM

20       A   During a switchover period that might have   09:42AM

21   happened, I don't know for certain.                09:42AM

22       Q   Okay.  And is Bandwidth still the SMS or the   09:42AM

23   texting vendor that Square uses in its Loyalty Program   09:42AM

24   today?                                             09:42AM

25       A   For loyalty, that's correct.               09:42AM
```

Page 32

```
 1        Q    And has that changed between 2018 and the current   09:42AM

 2   day?                                                          09:42AM

 3        A    Not since that change.                             09:42AM

 4        Q    Have there been any additional vendors used        09:42AM

 5   between 2018 and the present day?                            09:42AM

 6        A    Not for the loyalty product.                       09:42AM

 7        Q    Okay.  So between Ms. Belluomini and Mr. Aleisa,   09:43AM

 8   would it fair to say that all their text messages that       09:43AM

 9   were sent would've either been sent through Twilio or --     09:43AM

10   and/or Bandwidth; is that correct?                           09:43AM

11        A    That is correct.                                   09:43AM

12        Q    And when Twilio or Bandwidth was sending these     09:43AM

13   messages, these were at the direction of Square; correct?    09:43AM

14        MR. PETERSEN:  Objection.  Beyond the scope.            09:43AM

15   Lacks foundation.  Calls for speculation.                    09:43AM

16   BY MR. KAZEROUNI:                                            09:43AM

17        Q    Mr. Fung, do you know the answer?                  09:43AM

18        A    Can you repeat the question, please.               09:43AM

19        Q    Sure.  When the text messages were being sent by   09:43AM

20   Twilio and/or Bandwidth, they were being sent at the         09:43AM

21   direction of Square; correct?                                09:43AM

22        MR. PETERSEN:  Same objections.  And by "beyond         09:43AM

23   the scope," of course I mean beyond the scope of the         09:43AM

24   court's current order of limiting the scope of discovery     09:44AM

25   in this deposition.                                          09:44AM
```

                                                        Page 33

| | | |
|---|---|---|
| 1 | to get points, would they also be given that disclosure? | 10:04AM |
| 2 | A    Yes. | 10:05AM |
| 3 | Q    So it happens every time that you participate in | 10:05AM |
| 4 | the Loyalty Program with all -- with all -- with all | 10:05AM |
| 5 | merchants? | 10:05AM |
| 6 | A    Can you repeat it? | 10:05AM |
| 7 | Q    Sure.  So it happens every single -- on every | 10:05AM |
| 8 | single occasion, not just the first time that you enroll | 10:05AM |
| 9 | with one particular merchant? | 10:05AM |
| 10 | A    That is correct. | 10:05AM |
| 11 | Q    And that was the policy between 2017 and the | 10:05AM |
| 12 | current day? | 10:05AM |
| 13 | A    That has always been the position, yes. | 10:05AM |
| 14 | Q    Okay.  If a consumer wants to opt out of the | 10:05AM |
| 15 | Loyalty Program before 2018, what would they have done? | 10:05AM |
| 16 | A    Are you asking if they have already enrolled or | 10:05AM |
| 17 | they just chose not to enroll? | 10:05AM |
| 18 | Q    If they've already enrolled but then they get a | 10:05AM |
| 19 | text message and they thought, you know what, I don't | 10:06AM |
| 20 | want -- I don't want these text messages anymore, what | 10:06AM |
| 21 | could they have done? | 10:06AM |
| 22 | A    Can you clarify?  Are you talking about them not | 10:06AM |
| 23 | wanting the loyalty -- not want wanting their loyalty | 10:06AM |
| 24 | account and not wanting to accrue points or simply they do | 10:06AM |
| 25 | not want to receive text messages? | 10:06AM |

Page 47

```
 1       Q    Let's just go to the text messages.            10:06AM

 2       A    They can always have texted "Stop" to stop     10:06AM

 3   receiving text messages.                                10:06AM

 4       Q    Okay.  Would you agree that the text messages  10:06AM

 5   didn't -- until at least 2018 did not have that language 10:06AM

 6   that advised consumers that if they wanted to opt out,  10:06AM

 7   they could press "Stop"?                                10:06AM

 8            MR. PETERSEN:  Objection.  Beyond the scope.   10:06AM

 9            You can respond as to these two plaintiffs.    10:06AM

10            THE WITNESS:  I believe before sending any first 10:06AM

11   message, the Square messaging system would first send a 10:06AM

12   welcome message which include the expectation that stop -- 10:07AM

13   would allow them to stop receiving messages.            10:07AM

14   BY MR. KAZEROUNI:                                       10:07AM

15       Q    Have you reviewed all the text messages for    10:07AM

16   Ms. Belluomini?                                         10:07AM

17       A    I received -- reviewed the text messages sent  10:07AM

18   from the loyalty software.                              10:07AM

19       Q    Okay.  And did any of those text messages that 10:07AM

20   was sent to Ms. Belluomini have that opt out language in 10:07AM

21   them?                                                   10:07AM

22            MR. PETERSEN:  Objection to the extent it      10:07AM

23   mischaracterizes the evidence with respect to the text  10:07AM

24   messages to Plaintiff Belluomini.                       10:07AM

25   ///
```

```
1    BY MR. KAZEROUNI:                                    10:07AM

2        Q   Mr. Fung?                                    10:07AM

3        A   Can you repeat the question, please.         10:07AM

4        Q   Sure.  In all the text messages that you have  10:07AM

5    seen regarding the Loyalty Program between Square and  10:07AM

6    Ms. Belluomini, did you see any opt out language in those  10:07AM

7    text messages from Square to Ms. Belluomini?         10:07AM

8        A   I believe they are not in the loyalty text.  10:07AM

9        Q   Okay.  But is it your contention that        10:08AM

10   Ms. Belluomini did receive a text at some point that told  10:08AM

11   her that she could opt out?                          10:08AM

12       A   That would be my expectation.                10:08AM

13       Q   Okay.  Have you seen any text messages that are  10:08AM

14   provided in discovery regarding Ms. Belluomini that showed  10:08AM

15   that?                                                10:08AM

16       A   I -- I don't know.  I'm not sure.            10:08AM

17       Q   Okay.                                        10:08AM

18       A   It's also been about an hour.  I would like to  10:08AM

19   take a break.                                        10:08AM

20           MR. KAZEROUNI:  Absolutely.  Yeah.  I apologize.  10:08AM

21   My intent was actually to take a break every one hour.  10:08AM

22           Is that okay with you, Shannon?              10:08AM

23           MR. PETERSEN:  Yeah.  That's fine.           10:08AM

24           MR. KAZEROUNI:  Okay.  Sure.  How long would you  10:08AM

25   like, Mr. Fung?                                      10:08AM
```

Page 49

|   |   |   |   |
|---|---|---|---|
| 1 | BY MR. KAZEROUNI: | 10:44AM |
| 2 | Q   The loyalty ones. | 10:44AM |
| 3 | A   The loyalty ones from 2017, I believe we do. | 10:44AM |
| 4 | Q   Okay.  And how far back do you go? | 10:44AM |
| 5 | A   I don't know. | 10:44AM |
| 6 | Q   Okay.  Who would know? | 10:44AM |
| 7 | A   If I were to tell engineers to look in the | 10:44AM |
| 8 | database, we can find out. | 10:44AM |
| 9 | Q   In your position, Mr. Fung, how many people work | 10:44AM |
| 10 | under you? | 10:44AM |
| 11 | A   Ten engineers. | 10:44AM |
| 12 | Q   Ten people work under you? | 10:44AM |
| 13 | A   Yes. | 10:44AM |
| 14 | Q   Okay.  Who is your direct supervisor? | 10:44AM |
| 15 | A   His name is Kwineet.  Kwineet Gunigo (phonetic.) | 10:44AM |
| 16 | Q   Kwineet is a male? | 10:44AM |
| 17 | A   Correct.  It's he. | 10:44AM |
| 18 | Q   Oh, okay.  'Cause I know a Kwineet as a female. | 10:44AM |
| 19 | That's why I was shocked.  Maybe it's unisex. | 10:44AM |
| 20 | And what about the retention policies on the | 10:45AM |
| 21 | receipts -- on the receipt text messages? | 10:45AM |
| 22 | A   Retention of -- can you repeat the question? | 10:45AM |
| 23 | Q   Yes.  Do you have -- so let's go back to 2017, | 10:45AM |
| 24 | for example.  From 2017 to the current day, have you got a | 10:45AM |
| 25 | record of all the text messages that were sent -- where | 10:45AM |

Page 63

```
 1   receipts were sent through text messaging?              10:45AM

 2        A    I believe we do, but that's outside of my team's   10:45AM

 3   control.                                               10:45AM

 4        Q    Who is in control of that team?              10:45AM

 5        A    The manager's name is Cliff Chen.            10:45AM

 6        Q    Is that C-h-e-n?                             10:45AM

 7        A    C-h-e-n.  Correct.                           10:45AM

 8        Q    Have you looked to see if either Ms. Belluomini   10:45AM

 9   or Mr. Aleisa received receipts through text messaging?   10:45AM

10        A    I think so, yes.                             10:45AM

11        Q    So you have seen -- you have checked?        10:46AM

12        A    I think that pertains to communication with my   10:46AM

13   lawyers.                                               10:46AM

14        Q    Well, I don't want to know what you talked with   10:46AM

15   your lawyers about, but have you, outside of that, checked   10:46AM

16   whether either Ms. Belluomini or Mr. Aleisa had received   10:46AM

17   text message receipts?                                 10:46AM

18        A    I don't recall.  The only one case I know we   10:46AM

19   looked at is that Ms. Belluomini had request a text   10:46AM

20   receipt at the previous merchant before.              10:46AM

21        Q    Before Taste Kitchen you mean?               10:46AM

22        A    Before Taste Kitchen.  That's the one that I do   10:46AM

23   recall.                                                10:46AM

24        Q    Did she receive a text receipt?              10:46AM

25        A    I can't be sure.  I only know we did -- a request   10:46AM
```

                                                            Page 64

| | | |
|---|---|---|
| 1 | was made by her to -- for a text receipt and we -- I | 10:47AM |
| 2 | expect that we would have fulfilled that request in | 10:47AM |
| 3 | sending out the text receipt, but I can't know if she had | 10:47AM |
| 4 | received it. | 10:47AM |
| 5 | Q   Where is that or where would that record be kept? | 10:47AM |
| 6 | A   In the receipt service.  It's a receipt backend | 10:47AM |
| 7 | service. | 10:47AM |
| 8 | Q   And are they at the headquarters in | 10:47AM |
| 9 | San Francisco? | 10:47AM |
| 10 | A   Yes.  I mean the team is -- the actual physical | 10:47AM |
| 11 | server that's living somewhere else. | 10:47AM |
| 12 | Q   Okay.  But you have access to it in the Bay? | 10:47AM |
| 13 | A   Yes. | 10:47AM |
| 14 | Q   Okay.  And did you actually check the record | 10:47AM |
| 15 | yourself or have somebody show you the record of whether | 10:47AM |
| 16 | Ms. Belluomini made such a request? | 10:47AM |
| 17 | A   I have seen the record that our engineer put up. | 10:47AM |
| 18 | Q   So you physically yourself seen that request? | 10:47AM |
| 19 | A   Can you repeat that? | 10:47AM |
| 20 | Q   You have physically yourself seen that request | 10:48AM |
| 21 | somewhere on your server? | 10:48AM |
| 22 | A   I did not do it myself, no. | 10:48AM |
| 23 | Q   So some -- did somebody look at it and tell you | 10:48AM |
| 24 | that they have seen it or did they show it to you? | 10:48AM |
| 25 | A   Somebody looked at it and told me so. | 10:48AM |

Page 65

| | | |
|---|---|---|
| 1 | Q    Who was that person? | 10:48AM |
| 2 | MR. PETERSEN:  Beyond the scope. | 10:48AM |
| 3 | Abbas, just to shorten this up, we've produced | 10:48AM |
| 4 | those.  So they're among the records that we produced. | 10:48AM |
| 5 | MR. KAZEROUNI:  No.  I don't think so. | 10:48AM |
| 6 | MR. PETERSEN:  I think so. | 10:48AM |
| 7 | MR. KAZEROUNI:  What Bates stamp? | 10:48AM |
| 8 | MR. PETERSEN:  I don't have that handy.  I | 10:48AM |
| 9 | believe it's in the document production. | 10:48AM |
| 10 | MR. KAZEROUNI:  You produced the receipt request? | 10:48AM |
| 11 | MR. PETERSEN:  I believe that we produced | 10:48AM |
| 12 | documents showing the electronic records of the receipt | 10:48AM |
| 13 | being sent as well as the receipt itself. | 10:48AM |
| 14 | MR. KAZEROUNI:  I've seen the receipt, but | 10:48AM |
| 15 | nothing in a text format or the request for a text format. | 10:48AM |
| 16 | MR. PETERSEN:  Off the top of my head, I can't | 10:48AM |
| 17 | say precisely what's in the document production you've got | 10:49AM |
| 18 | in front of you.  Maybe it will become clear as you march | 10:49AM |
| 19 | through the documents. | 10:49AM |
| 20 | MR. KAZEROUNI:  Yeah.  What's the Bate?  Okay. | 10:49AM |
| 21 | Yeah.  I think the only thing I have is Bate 14, Shannon. | 10:49AM |
| 22 | I haven't received what -- what you're describing. | 10:49AM |
| 23 | I've seen -- I've seen receipts, but not in -- | 10:49AM |
| 24 | not in a form of a text being sent or any kind of request | 10:49AM |
| 25 | that, you know, translates on the Square software or | 10:49AM |

Page 66

| | | |
|---|---|---|
| 1 | MR. PETERSEN:  Same objections. | 10:54AM |
| 2 | THE WITNESS:  I -- I do not. | 10:54AM |
| 3 | BY MR. KAZEROUNI: | 10:54AM |
| 4 | Q   Okay.  And the same question as to any of the | 10:54AM |
| 5 | text messages that Mr. Aleisa received.  Do you have any | 10:54AM |
| 6 | factual belief that Mr. Aleisa was not harmed in any way | 10:54AM |
| 7 | by any of those text messages? | 10:54AM |
| 8 | MR. PETERSEN:  Same objections. | 10:54AM |
| 9 | THE WITNESS:  I do not. | 10:54AM |
| 10 | BY MR. KAZEROUNI: | 10:54AM |
| 11 | Q   Okay.  Do you see on paragraph 70 of the | 10:54AM |
| 12 | complaint, which is page 18, Yana, do you see the -- the | 10:55AM |
| 13 | text message to the right underneath the 844 number?  It | 10:55AM |
| 14 | says: | 10:55AM |
| 15 | "Welcome to SMS message from | 10:55AM |
| 16 | Square.  Reply with help for more or | 10:55AM |
| 17 | end to unsubscribe from receiving | 10:55AM |
| 18 | messages.  Standard rates apply." | 10:55AM |
| 19 | Do you see that language regarding the potential | 10:55AM |
| 20 | opt out if somebody wants to no longer receive these text | 10:55AM |
| 21 | messages? | 10:55AM |
| 22 | A   Yes. | 10:55AM |
| 23 | Q   So do you know why that was being sent in 2018 | 10:55AM |
| 24 | but not in 2017? | 10:56AM |
| 25 | MR. PETERSEN:  Objection to the extent it calls | 10:56AM |

Page 70

```
 1    for attorney-client communication.                    10:56AM

 2    BY MR. KAZEROUNI:                                      10:56AM

 3        Q   I don't want you to talk about anything that your   10:56AM

 4    lawyers talked to you.  But to the degree you know     10:56AM

 5    yourself, do you know why that -- that message was being  10:56AM

 6    sent in 2018 but not in 2017?                          10:56AM

 7        A   Why?  I don't know.                            10:56AM

 8        Q   Was there a policy change to make that new     10:56AM

 9    language being text in 2018?                           10:56AM

10            MR. PETERSEN:  Same objection.                 10:56AM

11            You can answer so long as you're not divulging  10:56AM

12    any attorney-client communications.                    10:56AM

13            THE WITNESS:  I'm not sure.                     10:56AM

14    BY MR. KAZEROUNI:                                      10:56AM

15        Q   Who would know that?                           10:56AM

16            MR. PETERSEN:  Same objections.                10:56AM

17            THE WITNESS:  Yeah.  I would have to find out.  I   10:56AM

18    don't know who the person would be.                    10:56AM

19    BY MR. KAZEROUNI:                                      10:56AM

20        Q   Okay.  Is that a difference that you did notice  10:56AM

21    yourself in 2018?                                      10:56AM

22        A   My understanding is the welcome text is sent when  10:56AM

23    we communicate with any phone number that has not received  10:57AM

24    text from a Square sender number before.               10:57AM

25        Q   Say that again.                                10:57AM
```

Page 71

1    A   I'm -- I'm not aware of a policy change.  I          10:57AM

2    expect welcome message to have been sent, but maybe that   10:57AM

3    changed outside of my knowledge.                            10:57AM

4        Q   Okay.  So you're saying that should have been      10:57AM

5    sent every time somebody enrolls with a new merchant on    10:57AM

6    their Loyalty Program?                                       10:57AM

7            Is that what you're saying?                          10:57AM

8        A   Not with a new merchant, but when -- depend on     10:57AM

9    what phone number we use to send the text and the welcome   10:57AM

10   should be sent based on the sender and receiver pair.       10:57AM

11       Q   Okay.  Do you know if that text was sent from the  10:58AM

12   904 number?                                                 10:58AM

13       A   I do not know.                                      10:58AM

14       Q   Do you know if that welcome message with that opt  10:58AM

15   out provision was ever sent to Mr. Aleisa?                  10:58AM

16       A   I would have to look at it.                         10:58AM

17       Q   Okay.  What about Ms. Belluomini?                   10:58AM

18       A   Yeah.  I -- I do not know.                          10:58AM

19       Q   Have you reviewed all the text messages to both    10:58AM

20   of these individuals?                                       10:58AM

21       A   Only the one that was sent by loyalty.             10:58AM

22       Q   Only the one that what?  Sorry.                     10:58AM

23       A   That was sent by the loyalty system.              10:58AM

24       Q   The loyalty system.  Okay.  So you reviewed all    10:58AM

25   the loyalty text messages to Ms. Belluomini and            10:58AM

                                                    Page 72

| | | |
|---|---|---|
| 1 | Mr. Aleisa; correct? | 10:58AM |
| 2 | A   Correct. | 10:58AM |
| 3 | Q   Do you remember, apart from the one that you see | 10:58AM |
| 4 | with the 844 number, any other welcome messages with the | 10:58AM |
| 5 | opt out provision to Mr. Aleisa or Ms. Belluomini from the | 10:58AM |
| 6 | other numbers, the 310 number and the 944 number? | 10:59AM |
| 7 | A   I do not know because, like I said, the welcome | 10:59AM |
| 8 | message is not sent by the loyalty system. | 10:59AM |
| 9 | Q   Oh, who is that sent by? | 10:59AM |
| 10 | A   It's sent by our own internal -- there is a | 10:59AM |
| 11 | service that rep- -- that encapsulate the communication | 10:59AM |
| 12 | with our vendor internally.  That service is responsible | 10:59AM |
| 13 | for that. | 10:59AM |
| 14 | Q   Who is the manager of that department? | 10:59AM |
| 15 | A   I do not recall off the top of my head. | 10:59AM |
| 16 | Q   Okay.  Did you inquire to see if Ms. Belluomini | 10:59AM |
| 17 | had received any of these welcome messages? | 10:59AM |
| 18 | A   I did not. | 10:59AM |
| 19 | Q   What about Mr. Aleisa with the 904 number? | 10:59AM |
| 20 | A   No, I did not. | 10:59AM |
| 21 | Q   Are they sent -- and these welcome messages, are | 10:59AM |
| 22 | they sent from a different number? | 10:59AM |
| 23 | A   They -- no.  They should be sent from the same | 11:00AM |
| 24 | number.  That's the whole point. | 11:00AM |
| 25 | Q   Right.  Okay.  So the welcome message comes | 11:00AM |

Page 73

```
 1    dir- -- like the way it's written, the one from the 844      11:00AM

 2    number, is written as if it's written from Square to         11:00AM

 3    Mr. Aleisa; is that fair?                                    11:00AM

 4        A    Can you repeat -- can you repeat that question,     11:00AM

 5    please.                                                      11:00AM

 6        Q    Sure.  So the other loyalty text messages, they     11:00AM

 7    are communications as if they're made from the -- the        11:01AM

 8    merchant.  So, for example, if you look at the first text    11:01AM

 9    on the 904 number, it says:                                  11:01AM

10              "You just got your first star                      11:01AM

11          from Samovar on Fillmore.  View your                   11:01AM

12          program details."  And then the link.                  11:01AM

13          So the communication is kind of portrayed as if        11:01AM

14    it's coming from Samovar, the merchant, whereas the one --   11:01AM

15    the text message on the right from the 844 number, the       11:01AM

16    welcome message, that is written as if it's coming from      11:01AM

17    Square?                                                      11:01AM

18              MR. PETERSEN:  Objection.  Document speak for      11:01AM

19    themselves.                                                  11:01AM

20    BY MR. KAZEROUNI:                                            11:01AM

21        Q    To the degree you know, Mr. Fung, is that the       11:01AM

22    intention?                                                   11:01AM

23        A    I'm not certain of the specific language design.    11:01AM

24    My understanding is that it's always, you know, Square       11:01AM

25    sending these message on behalf of the merchant.            11:01AM
```

Page 74

```
 1    BY MR. KAZEROUNI:                                    12:05PM

 2        Q    I'm sorry.  Say that again.                 12:05PM

 3        A    It's only exact to the extent of what the   12:05PM

 4    software is running that instruct the -- the -- the  12:05PM

 5    display device to display.                           12:05PM

 6        Q    I don't understand your response.  Can you  12:05PM

 7    rephrase it?                                         12:05PM

 8        A    The -- you're asking if the screen shots of the  12:05PM

 9    video is the exact recreation.  So it is exact to the  12:06PM

10    extent it represent what the software at that day would  12:06PM

11    have displayed, requested the hard to display on -- on the  12:06PM

12    screen.                                              12:06PM

13        Q    So are you saying the data is exact but the way  12:06PM

14    that it's presented, is that also exact?             12:06PM

15        A    The exact presentation cannot -- cannot be exact.  12:06PM

16        Q    Okay.  So paragraph 12 of your declaration, do  12:06PM

17    you stand by this statement that:                    12:07PM

18             "Square has no record of plaintiff          12:07PM

19             receiving any other Loyalty Program         12:07PM

20             text messages."                             12:07PM

21        A    For Plaintiff Belluomini, that's correct.   12:07PM

22        Q    Do you count welcome messages as part of the  12:07PM

23    loyalty text messages?                               12:07PM

24        A    No.  That's not a loyalty message.          12:07PM

25        Q    So do you know if Ms. Belluomini received a  12:07PM
```

Page 105

1    welcome text message?                                      12:07PM

2        A    I do not know.                                    12:07PM

3        Q    Was it part of policy and procedure in May of     12:07PM

4    2017 that when somebody like Ms. Belluomini opted into the 12:07PM

5    Loyalty Program they would have received a welcome         12:07PM

6    message?                                                   12:07PM

7        A    I don't recall back then.                         12:07PM

8        Q    What is a pony?                                   12:08PM

9        A    A pony, it's a small horse.                       12:08PM

10       Q    As far as the -- what about your declaration,     12:08PM

11   Exhibit A, there's a pony mentioned?                       12:08PM

12       A    I think that's what our -- our software engineers 12:08PM

13   when they -- when he was testing the software, it uses     12:08PM

14   that as his reward.  So in this case, the -- the Loyalty   12:08PM

15   Program was configured so that the reward is a pony.  It   12:09PM

16   can be anything that the merchant actually creates -- the  12:09PM

17   merchant actually configures.                              12:09PM

18       Q    So that was the -- was that the reward that       12:09PM

19   Taste Kitchen was using in 2017, was it five stars for a   12:09PM

20   pony or is it some -- sorry.                               12:09PM

21       A    Definitely not.                                   12:09PM

22       Q    Okay.  So that would be different; right?         12:09PM

23       A    That's correct.                                   12:09PM

24       Q    So your software engineer could not figure out    12:09PM

25   what the reward was in 2017?                               12:09PM

Page 106

Veritext Legal Solutions
866 299-5127