UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MISHARI ALEISA, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>SQUARE, INC., A DELAWARE CORPORATION,<br><br>    Defendant. | Case No. 20-cv-00806-EMC<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING DEFENDANT'S MOTION TO STAY**<br><br>Docket Nos. 33, 42 |

Plaintiffs Mishari Aleisa and Nicole Belluomini filed a putative class action against Defendant Square, Inc. ("Square") asserting claims for violation of the Telephone Consumer Protection Act ("TCPA" or the "Act"), 47 U.S.C. §§ 201–231. *See* Docket No. 1 ("Compl."). Plaintiffs allege that Square texted them without their authorization in violation of the Act. *See id.*

Pending before the Court are Square's (1) amended motion to dismiss Belluomini's claims for lack of Article III standing under Federal Rule of Civil Procedure 12(b)(1);[1] and (2) motion to stay pending the Supreme Court's decision in *Facebook, Inc. v. Duguid* (*Duguid II*), No. 19-511 (U.S. filed Oct. 17, 2019). *See* Docket Nos. 33 (amending Docket No. 23), 42. For the reasons discussed below, Square's motion to dismiss is **DENIED** and its motion to stay is **GRANTED**.[2]

///

///

---

[1] Defendant does not move to dismiss Aleisa's claims at this time.

[2] Because the Court grants Square's motion to stay pending the *Duguid II* decision, it need not address Square's motion to stay this action pending the Federal Communications Commission's (FCC's) definition of the statutory term "automatic telephone dialing system" (ATDS). *See* Docket No. 25.

# I. BACKGROUND

A. Factual Background

The complaint alleges as follows. Belluomini is the regular and sole user of the cellphone number ending in 4446. Compl. ¶ 80. On May 12, 2017, Belluomini visited Taste Kitchen & Table ("Taste") in Fairfax, California. *Id.* ¶ 81. After placing her order, Taste processed Belluomini's credit card payment through Square's point-of-sale (POS) system. *Id.* ¶ 82. Belluomini alleges that she did not enter her cellphone number to receive a copy of her digital receipt or to earn loyalty rewards at Taste. *Id.* ¶ 83. Almost immediately after her transaction, however, Belluomini received the following automated text message from Square:



*Id.* ¶ 84–85. The link within the text message redirects to Square's website for Taste's loyalty program. *Id.* ¶ 86. According to Belluomini, Square's text messages caused her actual harm, including "an invasion of privacy," a "private nuisance," diminished battery life, and lost time. *Id.* ¶ 92.

Aleisa is the regular and sole user of the cellphone number ending in 5566. Compl. ¶ 57. On July 28, 2018, Aleisa visited Samovar Teashouse Café ("Samovar") in San Francisco, California. *Id.* ¶ 58. After placing his order, Samovar processed Aleisa's credit card payment through Square's POS system. *Id.* ¶ 59. The POS system invited Aleisa to join Samovar's loyalty program by providing his cellphone number, and he did. *Id.* ¶ 60. Almost immediately after the transaction, Aleisa received a text message stating that he earned a "loyalty star" from Samovar because of his purchase, which he could accumulate toward free products. *Id.* ¶ 61. According to Aleisa, he also received three other text messages following purchases at other food and beverage

retailers without his authorization. *Id.* ¶¶ 65, 69, 71–73.

Importantly, both Plaintiffs allege that "Square sent loyalty texts to Plaintiff's cellphone number (and those of the putative class members) by using an ATDS as defined by 47 U.S.C. § 227(a)(1)." *Id.* ¶¶ 76, 89, 97, 98, 114, 117, 126(b), 133, 144,

B. Procedural History

On February 3, 2020, Plaintiffs filed a complaint against Defendant alleging non-willful (Count 1) and willful (Count 2) violations of the TCPA, which prohibits making "any call (other than a call made . . . with the prior express consent of the called party) using any automatic telephone dialing system [ATDS] or any artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii).

On April 17, 2020, Square filed its motion to dismiss Belluomini's claims for lack of Article III standing under Rule 12(b)(1), *see* Docket No. 23 ("MTD"), which it amended on July 2, 2020, *see* Docket No. 33 ("Am. MTD"). Meanwhile, Square also moved to stay this action pending the resolution of an FCC petition that it contends will decide how the agency interprets the term "ATDS." *See* Docket No. 25 ("First MTS") at 9. On August 7, 2020, Square filed a second motion to stay this action, this time pending the Supreme Court's decision in *Facebook, Inc. v. Duguid*, No. 19-511 (U.S. filed Oct. 17, 2019). *See* Docket No. 42 ("Second MTS").

## II.   LEGAL STANDARD

A. Motion to Dismiss Under Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss for lack of subject matter jurisdiction. When subject matter jurisdiction is challenged, "[t]he party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists." *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986). A Rule 12(b)(1) motion will be granted if the complaint, considered in its entirety, fails on its face to allege facts sufficient to establish subject matter jurisdiction. *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 (9th Cir. 2003). "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under [Rule] 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

3

1    The "irreducible constitutional minimum" of standing requires a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins* ("*Spokeo II*"), 136 S. Ct. 1540, 1547 (2016). These three elements are referred to as, respectively, injury-in-fact, causation, and redressability. *Planned Parenthood of Greater Was. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," which at the pleadings stage means "'clearly . . . alleg[ing] facts demonstrating' each element." *Spokeo II*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

B.   Motion to Stay

A court's power to stay proceedings is incidental to its inherent power to control the disposition of its cases in the interests of efficiency and fairness to the court, counsel, and litigants. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In determining whether to stay proceedings, the district court "must weigh competing interests and maintain an even balance" between the hardships that would be suffered by the parties if a stay were or were not granted, as well as judicial economy. *Id.* at 254–55. "If there is even a fair possibility" that the stay will harm the non-moving party, the party seeking the stay "must make out a clear case of hardship or inequity in being required to go forward." *Id.* at 255.

The Ninth Circuit has clarified that these competing interests include:

> (1) the possible damage which may result from the granting of a stay, (2) the hardship or inequity which a party may suffer in being required to go forward, and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.

*CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis,* 299 U.S. at 254–55). However, "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005).

4

### III.     MOTION TO DISMISS

Square contends that Belluomini lacks Article III standing because she has failed to allege injury-in-fact and causation.[3] Neither of these arguments has merit.

A.     Injury-in-fact

Square's first argument is that the receipt of a single text message, even without consent and in violation of the TCPA, is not enough for Article III standing. Am. MTD at 8. In support of this proposition, Square cites to the Eleventh Circuit's decision in *Salcedo v. Hanna*, where the court held that a text message is akin to "having a flyer briefly waived in one's face . . . [a]nnoying, perhaps, but not a basis for invoking the jurisdiction of the federal courts." 936 F.3d 1162, 1172 (11th Cir. 2019). Whatever the reach of standing under *Salcedo*, this Court is governed by Ninth Circuit law. Notably, *Salcedo* does distinguish *Van Patten*: "We note that out sister circuit has reached the opposite conclusion in this context." 936 F.3d at 1170 (citing *Van Patten*, 847 F.3d at 1043

The Ninth Circuit's decision in *Van Patten* governs. *Van Patten* held that a single telephone call or text message from a telemarketer is sufficient to satisfy Article III's injury-in-fact requirement. In *Van Patten,* the plaintiff provided his cellphone number to a gym in the process of signing up for a gym membership. 847 F.3d 1037, 1040 (9th Cir. 2017). After the plaintiff cancelled his membership, the gym texted Van Patten to offer him a special deal to rejoin the gym. *Id.* at 1041. The panel held that Congress established the TCPA to protect the plaintiff's substantive right to privacy, namely the right to be free from unsolicited telemarketing phone calls or text messages that "invade the privacy and disturb the solitude of their recipients." *Id.* at 1043. Therefore, "a violation of the TCPA is a concrete, *de facto* injury." *Id.* Significantly, the court stated "a" violation of the TCPA is sufficient. The court did not require multiple texts in order to constitute "a" TCPA violation. Moreover, the court noted "a plaintiff alleging a violation under the TCPA 'need not allege any *additional* harm beyond the one Congress identified," which is that he/she/they received an unsolicited text message or telephone call from a telemarketer. *Id.*

---

[3] Square does not contest that Belluomini's injuries are redressable.

5

1  (quoting *Spokeo II*, 136 S. Ct. at 1549).  *See also Duguid v. Facebook, Inc.* ("*Duguid I*"), 926 F.3d

2  1146, 1150 (9th Cir. 2019), *cert. granted in part*, No. 19-511, 2020 WL 3865252 (U.S. July 9,

3  2020) (reaffirming *Van Patten*'s holding that a person who alleges receiving unsolicited text

4  messages "adequately alleges a concrete injury in fact" under the TCPA).

5         Square cites to recent decisions from the Southern District of California that are readily

6  distinguishable.  *Selby v. Ocwen Loan Servicing, LLC* is inapplicable to the facts of this case

7  because it involved debt-collection calls, which are exempted from the TCPA's prohibition against

8  telemarketing calls.  *See* No. 3:17-CV-973-CAB-BLM, 2017 WL 5495095, at *3 ("Calls from

9  debt collectors are undoubtedly unwanted, stressful, and frustrating, but the TCPA was not

10 intended to protect any concrete interests associated with calls from debt collectors or creditors.").

11 *Shuckett v. DialAmerica Mktg* is also distinguishable not only because it was a summary judgment

12 decision, but also because the plaintiff in that case did not allege or introduce any evidence that

13 she was aware of the call and that it caused her a nuisance.  No. 17CV2073-LAB (KSC), 2019 WL

14 3429184, at *3 (S.D. Cal. July 30, 2019) ("While a missed call may be sufficient to confer

15 standing if the plaintiff can demonstrate that he or she was aware of the call and it caused

16 nuisance, it is not sufficient for a plaintiff to allege simply that he or she *would have been aware*

17 of the call given what they were doing on that day.").

18        Accordingly, Belluomini's allegations that she received an unsolicited text message from

19 Square regarding Taste's loyalty program are sufficient to satisfy Article III's injury-in-fact

20 requirement.

21 B.    <u>Causation</u>

22        Square's lack-of-causation argument is premised on the disputed fact that Belluomini

23 provided Square with her cellphone number and explicitly consented to enroll in Taste's loyalty

24 program and to receive automated marketing texts from Square pertaining to that program.  Am.

25 MTD at 8, 10–12.  Indeed, the *Van Patten* court dismissed the plaintiff's TCPA claims in that case

26 because he "gave prior express consent to receive Defendant's text messages" by giving the gym

27 "his cellular telephone number for the purpose of a gym membership contract."  847 F.3d at 1045.

28 Therefore, unless plaintiff expressly withdrew his consent, the gym could send him automated text

6

messages "about some things, such as follow-up questions about his gym membership application." *Id.* With consent, her TCPA claims would likely fail as a matter of law.[4]

In the complaint, however, Belluomini specifically alleges that she did *not* provide Square with her cellphone number, let alone consent to receive texts from Taste's loyalty program. Compl. ¶ 83. Therefore, if the Court focuses exclusively on the specific allegations in the complaint—as it must under *Iqbal/Twombly*—Square's argument cannot prevail at this juncture. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] court must accept as true all of the allegations contained in a complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The more fundamental problem with Square's argument is that it goes to the merits, not standing. As Judge Gonzalez Rogers recently explained in *Berman v. Freedom Fin. Network, LLC*,

> *Defendants here confuse causation of plaintiff's injury with a defense to liability.* To establish the TCPA injury, all Berman need show is that he was contacted by defendants by means of an ATDS. . . . Express consent is an affirmative defense on which defendants bear the burden, in other words, an excuse for an otherwise liable defendant. Should defendants establish Berman's express consent, they can avoid liability to him *but will not eliminate this Court's jurisdiction to decide his claim.*

400 F. Supp. 3d 964, 982 (N.D. Cal. 2019) (emphasis added). Contesting the merits of causation, a common matter in dispute in tort and statutory cases, does not raise a constitutional standing

---

[4] Square also cites to several decisions from this district for the proposition that a defendant does not "make" a text message or call within the meaning of the TCPA where the text message is triggered by the user's actions. Mot. 10–13. But all of those cases are distinguishable because they involved a user of an application or service—either the plaintiff or a third party—actively choosing to send text messages to some of its contacts through the application. *See, e.g.*, *Cour v. Life360, Inc.*, No. 16-CV-00805-TEH, 2016 WL 4039279, at *3 (N.D. Cal. July 28, 2016) ("Here, by contrast, Life360 users choose which of their contacts should receive an invitation and then press an 'invite' button before invitations are sent."); *Figueroa v. Everalbum, Inc.*, No. C 17-05909 JSW, 2018 WL 3399404, at *3 (N.D. Cal. May 9, 2018), *rev'd on other grounds*, 809 F. App'x 399 (9th Cir. 2020) ("The Ever App only sends invitational texts when a user makes the affirmative choice to allow the user to allow the App to access her list of contacts."); *Huricks v. Shopkick, Inc.*, No. C-14-2464 MMC, 2015 WL 5013299, at *3 (N.D. Cal. Aug. 24, 2015) ("Shopkick offers evidence that, at the time plaintiffs received the subject texts, a user of its app 'must [have] proceed[ed] through a multi-step invitation flow within the app' to cause text messages to be sent to contacts in the user's phone.").

7

issue in every case. *Cf. Paul v. Davis*, 424 U.S. 693, 700 (1976) (holding that there is no constitutional "right to be free of injury wherever the State may be characterized as the tortfeasor" because "such a reading would make of the Fourteenth Amendment a font of tort law").

Even if standing were somehow implicated, a "[j]urisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues *going to the merits* of an action." *Id.* (emphasis added) (quoting *Sun Valley Gas., Inc. v. Ernst Enters.*, 711 F.2d 138, 140 (9th Cir. 1983)). Such is the case here.

Square purports to offer *extrinsic* evidence that she received the text message because she agreed to Taste's loyalty program, confirmed her cellphone number, and pressed "Claim Your Star." Am. Mot. at 12. Square contends that the Court can consider this extrinsic evidence of consent because Square is mounting a "factual attack" to the complaint under Rule 12(b)(1), whereby "the challenger *disputes the truth of the allegations* that, by themselves, would otherwise invoke federal jurisdiction." *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (emphasis added) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).[5] But not providing "express consent" is a necessary requirement of Belluomini's TCPA claim that is spelled out on the face of the statute. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting telemarketing calls "other than a call made . . . with the *prior express consent* of the called party" (emphasis added)). Thus, there is no way that the Court can resolve Square's factual attack on the Court's jurisdiction without also deciding the merits of Belluomini's TCPA claim. *See Berman*, 400 F. Supp. 3d at 979 (explaining that the court previously denied Rule 12(b)(1) motion to dismiss because "there are factual issues in dispute that cannot be determined based upon the record here"). This is a key factual dispute going to the merits and not appropriate for resolution as a standing question.

In sum, because the complaint alleges sufficient facts to establish injury-in-fact and

---

[5] By contrast, a "facial attack" occurs when a "challenger asserts that the allegations contained in the complaint are *insufficient on their face* to invoke federal jurisdiction." *Wolfe*, 392 F.3d at 363 (emphasis added) (quoting *Safe Air for Everyone*, 373 F.3d at 1039)).

causation under Article III, Square's 12(b)(1) motion to dismiss is **DENIED**.

## IV.     MOTION TO STAY

Square also moves to stay the proceedings in this action pending the anticipated Supreme Court's decision in *Duguid II*. Second MTS at 6.

A.     The Definition of ATDS

The TCPA defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphases added). The TCPA empowers the FCC "to prescribe regulations to implement the requirements of this subsection." 47 U.S.C. § 227(b)(2); 47 C.F.R. § 1.2(a).

In July 2015, the FCC issued a declaratory order defining ATDS as any "dialing equipment [that] generally has the capacity to store or produce, and dial random or sequential numbers even if it is not presently used for that purpose, including when the caller is calling a set list of consumers." *In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991* ("2015 Order"), 30 FCC Rcd. 7961, 7971–72 (July 10, 2015). On March 16, 2018, the D.C. Circuit set aside this definition of ATDS as "an unreasonably expansive interpretation of the statute" because it "would appear to subject ordinary calls from any conventional smartphone to the Act's coverage." *ACA Int'l v. FCC*, 885 F.3d 687, 692 (D.C. Cir. 2018). After *ACA International*, the circuit courts have split on defining ATDS.[6]

---

[6] *Compare Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1304–05 (11th Cir. 2020) ("Because neither phone system used randomly or sequentially generated numbers . . . the Act does not cover them."), *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020) (holding that the system at issue is not an ATDS because it "neither stores nor produces numbers using a random or sequential number generator"), *and Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018) ("The TCPA's prohibition on autodialers is [] not the proper means of redress" because "the prior owner of Dominguez's telephone number had affirmatively opted to receive them, not because of random number generation"), *with Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 280 (2d Cir. 2020) (holding that the defendant's program was an ATDS even though it did not store numbers using a random or sequential number generator), *Allan v. Penn. Higher Educ Assistance Agency*, 968 F.3d 567, 578–79 (6th Cir. 2020)(holding that an ATDS is an equipment that can automatically dial stored telephone numbers even if it does not store those numbers using an automated or sequential number generator), *and Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049–50 (9th Cir. 2018) ("[T]he statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically").

9

In *Duguid I*, the plaintiff alleged that "Facebook maintained a database of phone numbers and—using a template and coding that automatically supplied the browser information and time of access—programmed its equipment to send automated messages to those numbers." 926 F.3d at 1150. The district court concluded that Facebook's platform was not an ATDS because "[p]laintiff's own allegations suggest *direct targeting* that is inconsistent with the sort of random or sequential number generation required for an ATDS." *Duguid v. Facebook, Inc.*, No. 15-CV-00985-JST, 2017 WL 635117, at *4 (N.D. Cal. Feb. 16, 2017) (emphasis added) (quoting *Flores v Adir Int'l, LLC*, No. 15-cv-00076-AB, 2015 WL 4340020, at *4 (C.D. Cal. July 15, 2015)). According to Square, the equipment it used to send Plaintiffs the loyalty text messages would not be an ATDS under this "direct targeting" exception because it only sends messages to specific customers immediately following their transactions, not randomly or sequentially. Second MTS at 8–9.

The Ninth Circuit reversed the district court, reasoning that

> In *Marks*, we clarified that the adverbial phrase "using a random or sequential number generator" modifies only the verb "to produce," and not the preceding verb, "to store." 904 F.3d at 1052. In other words, an ATDS need not be able to use a random or sequential generator to store numbers—it suffices to merely have the capacity to "store numbers to be called" and "to dial such numbers automatically." *Id.* at 1053.

*Duguid I*, 926 F.3d at 1151. As a result, the Ninth Circuit defined ATDS as "equipment which has the capacity—(1) to store numbers to be called <u>or</u> (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically." *Duguid I*, 926 F.3d at 1150 (quoting *Marks*, 904 F.3d at 1053). This broad definition "includes a device that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator." *Marks*, 904 F.3d at 1043. The equipment that Square used to send Plaintiffs' loyalty text messages likely falls under this definition of ATDS.

On July 2, 2020, the Supreme Court granted Facebook's petition for certiorari in *Duguid II*, scheduling oral argument for December 8, 2020. 2020 WL 3865252, at *1. In doing so, the Supreme Court agreed to decide the following question:

> Whether the definition of ATDS in the TCPA encompasses any

10

> device that can "store" and "automatically dial" telephone numbers, even if the device does not "us[e] a random or sequential number generator."

Petition for Writ of Certiorari, *Duguid II*, No. 19-511 (U.S. filed Oct. 17, 2019). The Supreme Court is likely to issue an opinion on this question in the first half of 2021, which should resolve the circuit split and provide a uniform definition of ATDS. It may also address the issue of capacity versus use.

B.      Stay Pending *Duguid II*

All three of the *Landis* factors weigh in favor of granting Square's motion to stay the proceedings pending the Supreme Court's forthcoming decision in *Duguid II*. First, and most importantly, issuing a stay until the Supreme Court decides *Duguid II* would greatly simplify a key question of law in the instant case—what constitutes an ATDS. There is no dispute that Plaintiffs must prove that Square sent them loyalty text messages using an ATDS. *See* 47 U.S.C. § 227(b)(1)(A)(iii). But whether Square used an ATDS will depend on how the Supreme Court defines that term in *Duguid II*. If the Supreme Court reverses the Ninth Circuit and holds that an ATDS must use a "random or sequential number generator," 47 U.S.C. § 227(a)(1), then Plaintiff's TCPA claim is likely doomed because, according to Square, the equipment it used to send loyalty text messages to Plaintiffs does not use a random or sequential number generator. In fact, Plaintiffs allege in the complaint that their cellphone numbers are "*captured, stored* and *linked* with the payment card used to complete the transaction," such that "Square . . . [*automatically*] sends *that consumer* . . . unsolicited 'loyalty texts' for marketing purposes." Compl. ¶¶ 13, 15, 17–18 (emphasis added). The complaint does not allege that Square's ATDS uses random or sequential number generator. Therefore, the Supreme Court's upcoming *Duguid II* opinion might not only decide an important legal question in this case, it could altogether dispose of Plaintiffs' complaint as a matter of law. *United States v. Garcia-Gomez*, No. 14-CR-00120-EMC-5, 2019 WL 331279, at *2 (N.D. Cal. Jan. 25, 2019) (granting a stay because the Supreme Court granted certiorari, and the Ninth Circuit ordered additional briefing, in cases that would define a term that is central to one of the defendant's claims); *Bay Area Surgical Grp., Inc. v. Aetna Life Ins. Co.*, No. 5:13-CV-05430 EJD, 2014 WL 2759571, at *3 (N.D. Cal. June 17,

1    2014) ("Efficiency and simplification resulting from the abatement of a federal action may weigh

2    in favor of a stay.").

3    Plaintiffs' rely heavily on *Komaiko v. Baker Techs., Inc.*, where the court denied the

4    defendant's request for a stay because

> [U]nder Ninth Circuit precedent that is not before the Supreme Court in [*Duguid II*], Baker's technology could still be considered an ATDS under Ninth Circuit law if it *has the capacity* to store or produce numbers 'using a random or sequential number generator,' regardless of whether it was being used for that purpose when it sent texts to the dispensaries' customers."

9    No. 19-CV-03795-DMR, 2020 WL 5104041, at *3 (N.D. Cal. Aug. 11, 2020). But as noted

10   above, the complaint herein does not allege the capacity to generate random or sequential

11   numbers, and at the hearing, Plaintiffs conceded they have no information at present to so indicate.

12   Second, "the early stage of this litigation weighs in favor of a stay." *Capella Photonics,*

13   *Inc. v. Cisco Sys., Inc.*, No. C-14-3348 EMC, 2015 WL 1006582, at *2 (N.D. Cal. Mar. 6, 2015).

14   The case is still in the pleadings stage, even though the parties have conducted very limited

15   jurisdictional discovery. "Consequently, very little substantive work has been done in this case,

16   and there are no immediately pressing deadlines or trial dates." *Id.* "In the absence of a stay, the

17   parties will have to expend time and money conducting discovery on an issue central to

18   Defendant's liability while lacking a clear idea of the law that will ultimately apply at summary

19   judgment or at trial." *Ambrezewicz v. LeadPoint, Inc.*, No. EDCV162331JGBKKX, 2017 WL

20   8185862, at *4 (C.D. Cal. May 8, 2017). Indeed, the parties and the Court would have to engage

21   in costly and time-consuming class action discovery and ongoing litigation, which could be

22   wasted if the Supreme Court reverses the Ninth Circuit in *Duguid II*. *Larson v. Trans Union, LLC*,

23   No. 12-CV-05726-WHO, 2015 WL 3945052, at *8 (N.D. Cal. June 26, 2015) ("[I]f the case is not

24   stayed, the Court, the parties, and the absent class members . . . would all face the risk of

25   dedicating substantial resources to proceedings that may ultimately prove unnecessary.").

26   Third, Plaintiffs argue that they will be prejudiced because a stay will cause "the

27   irretrievable loss of critical evidence." Docket No. 49 ("Opp'n to MTS"), at 12–14. Specifically,

28   Plaintiffs worry that Twilio and Bandwidth, Square's former vendors who sent the text messages

at issue in this case, will destroy their records related to the text messages. *Id.* at 12. Indeed, Plaintiffs have submitted evidence that they are likely to "struggle in obtaining text message logs from third party carriers because carrier's average retention period of text message logs (without consent) is approximately 18-24 months." *Id.* at 13. These are legitimate concerns, but the Court is convinced that the parties have several tools at their disposal—like preservation agreements or preservation subpoenas, for example—that can preserve relevant third-party vendor information while the case is stayed. Moreover, Square risks sanctions, including issues or presumption sanctions, if relevant discovery is lost. Therefore, with the appropriate protective measures in place, the risk of potentially lost evidence is insufficient to deny a stay in the face of a pending Supreme Court decision that will decide a key legal question in the case. *Larson*, 2015 WL 3945052, at *8 ("I agree with Trans Union that it is implausible that a one-year delay will cause either of these things to occur, and Larson provides no specific facts or reasoning that indicate otherwise."); *Bay Area Surgical Grp.*, 2014 WL 2759571, at *5 ("This nebulous contention [regarding the risk of lost evidence] is entirely unsupported, however; just what evidence is at risk and how it could possibly be lost or destroyed is a mystery.").[7]

Accordingly, Square's motion to stay the proceedings in this action pending the Supreme Court's decision in *Duguid II* is **GRANTED**. The parties are directed to meet, confer, and notify the Court on the best way to preserve relevant evidence in the hands of Square's third-party vendors. The Court will maintain the stay if the parties provide the Court sufficient assurances that relevant third-party vendor information will be preserved for the duration of the stay. If such assurances are not provided, the Court reserves the authority to allow limited preservative discovery directed to those third-party vendors.

///

///

///

///

---

[7] If, however, the Court becomes convinced that no adequate protective measure can be established, it will consider permitted limited preservative discovery.

## V. CONCLUSION

Square's motion to dismiss is **DENIED**. Square's motion to stay pending the Supreme Court's decision in *Duguid II* is **GRANTED**.

This order disposes of Docket Nos. 23, 25, 33, and 42.

**IT IS SO ORDERED**.

Dated: October 9, 2020

_____
EDWARD M. CHEN
United States District Judge